**Opinion issued October 31, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00764-CR

_____

**RUSSELL AARON HESTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Case No. 17-CR-2105**

---

## O P I N I O N

A jury found appellant Russell Aaron Hester guilty of engaging in organized criminal activity and assessed his punishment at ten years' confinement.[1] In two issues, Hester asserts on appeal that: (1) the trial court erred in admitting, over

---

[1]    *See* TEX. PENAL CODE § 71.02.

Hester's objection, unauthenticated text messages between the undercover detective and a third party; and (2) the evidence was insufficient to establish a "combination" as required to support Hester's conviction for engaging in organized crime. Because we conclude that the trial court did not abuse its discretion in ruling that the text messages had been properly authenticated and that the evidence was sufficient to establish the elements of engaging in organized crime, we affirm.

## Background

After receiving multiple tips from neighbors regarding suspicious activity, the League City Police Department began surveilling the house at 612 Brunswick in League City, Texas. Lieutenant S. Antly testified that he supervised the investigation into the Brunswick house, which he described as a "problem house." Lieutenant Antly testified that he had been "out there previously on another call" that was "narcotics-related." Detective T. Knowlton, who also participated in the investigation, testified that the tip from the neighbors specifically referenced James Lafrenz, a resident of the house, as "the most likely suspect" for dealing drugs.

During surveillance operations, detectives observed people coming and going from the house and made traffic stops when appropriate to conduct further investigation. Detectives were not able to obtain video surveillance or photographs because they did not want to draw the attention of the house's occupants or

2

visitors. Lieutenant Antly testified that the Brunswick house was on "the very back street of [a] small subdivision" with only "one way in, one way out." He testified that officers with cameras would have been very noticeable, "[e]specially [at the Brunswick] house, very obvious, because there was very little traffic on that street besides that house."

On June 20, 2017, Detective R. Haunschild, acting undercover, made his first purchase of a small amount of methamphetamine from Lafrenz at the Brunswick house. Detective Knowlton and other personnel observed from a distance and were available to assist if Detective Haunschild needed it.

On June 27, 2017, Detective Haunschild returned to the Brunswick house and made another small purchase of methamphetamine from Lafrenz. Detective Haunshcild observed that Lafrenz retrieved the drugs from the master bedroom closet, and Haunschild observed that the closet also contained "a scale, methamphetamines and baggies" in addition to other miscellaneous items. Following this sale, Haunschild was able to obtain Lafrenz's phone number and began communicating with him by phone.

At this point, detectives were hoping to find out who was supplying Lafrenz with the drugs that he was selling, so on June 29, 2017, Detective Haunschild and Detective A. Strachan went to the Brunswick house again, this time to try to buy a larger amount of methamphetamine, an eighth of an ounce, also referred to as an

"eight-ball." Detective Knowlton, who was conducting surveillance while the other detectives acted as undercover drug buyers, testified that he had observed a Silver Saturn in the Brunswick house's driveway before the undercover detectives arrived and that it was gone by the time Detectives Haunschild and Strachan arrived. Detective Strachan likewise testified that the only car at the Brunswick house when they arrived was a Mercury Montego registered to Montgomery.

Detective Haunschild testified that, when he arrived at the house, Lafrenz was there with Montgomery. This was the first time Haunschild had interacted with Montgomery, but he testified that it appeared to him that Montgomery was "aware of what was happening." While Detective Strachan waited in the car, Detective Haunschild asked Lafrenz if he could sell them an eight-ball. According to Detective Haunschild, Lafrenz stated that he could not supply that amount, but Lafrenz also stated that his "dealer had just left and he could call him back to the house." They agreed on a price of $130 for the sale. At that point, Haunschild got Detective Strachan from the car and they waited in the house for Lafrenz's dealer to arrive.

According to Detective Strachan, after Haunschild came to get her from the car, they both went inside the house. She testified that, after entering the house, she and Haunschild "talked in the kitchen with James Lafrenz and Steven Montgomery, the two people that lived in the house. And Montgomery ended up

4

going into a front bedroom while we still talked with Lafrenz." Detective Strachan testified that these conversations were "narcotics-related." Detective Knowlton likewise testified that Lafrenz and Montgomery were at the Brunswick house during this deal.

Detectives Strachan and Haunschild waited approximately ten minutes until Lafrenz's dealer—later identified as Hester—arrived. Strachan stated that Hester "seemed very familiar to be able to just walk in and go straight to the master bedroom." Detective Haunschild likewise testified that, when Hester arrived, he and Lafrenz "were conversing in the living room. And I heard a brief knock on the door, and Mr. Lafrenz yelled, 'Come in,' as the person was entering the home." Haunschild testified that, based on his observations, Hester was "very knowledgeable" about the layout of the house. Even though there were multiple ways to get from the front door to where he and Lafrenz were conversing, Hester "took the most opportune route through the kitchen area, met with Mr. Lafrenz briefly and walked back into Mr. Lafrenz's master bedroom without being accompanied by the master of the home." At some point, Lafrenz had a "brief" conversation with Hester in which Lafrenz told Hester, "I told them $130," apparently in reference to the cost for purchasing an eight-ball of methamphetamine.

According to Detective Strachan, Hester came out of the bedroom with "a large piece of crystal meth and he commented on how much it was and then he went back in the bedroom. We weren't there to purchase that large amount." Detective Haunschild testified that Hester told them that the shard weighed 15 grams and that he intended to break off a smaller amount to sell to Haunschild and Strachan. Hester then returned to the master bedroom.

Detective Strachan testified that she gave $130 in cash to Detective Haunschild, and Hester came out of the bedroom a second time "with a smaller baggie with what appeared to be closer to the amount that we were going to buy." Haunschild confirmed the weight of the drugs in the baggie and then paid Hester with the money he had gotten from Strachan.

After completing the purchase, Detectives Haunschild and Strachan left "almost immediately," while Hester was still at the Brunswick house. Detective Strachan observed a silver Saturn in the driveway. Using information that she obtained from running the Saturn's license plate information through police databases, Detective Strachan learned that the silver Saturn belonged to Hester, and she discovered several associated addresses, including one in Seabrook. Detective Haunschild testified that the team wanted to set up another drug purchase directly with Hester.

6

Detective Haunschild texted with Lafrenz to obtain contact information for Hester. Haunschild then texted Hester to arrange a purchase for an even larger amount of methamphetamine—either a quarter or a half of an ounce. Hester indicated that he could get a "quarter" to sell to Haunschild and provided Haunschild with his address so that the two could meet up to get the drugs.

On July 7, 2017, Detective Haunschild picked Hester up from his home in Seabrook. Haunschild observed the silver Saturn at Hester's house. Haunschild and Hester drove around and had a conversation about Hester's ability to sell the requested amount of drugs. According to Detective Haunschild, Hester "said that he had different connects" and that "his girl plug [or supplier] could possibly fill the order, but she had fallen off the map. . . . And then he started making additional phone calls to try and fulfill that order that we agreed upon."

Hester also mentioned Montgomery during this conversation. While Haunschild was in the car with him, Hester called "Steve" on the phone in an attempt to find a supplier for the drugs, and Hester later confirmed that "Steve" was the same man—Montgomery—who had been at the house during the June 29 drug deal. Detective Haunschild testified that he and Hester were unable to complete the deal at that time, so they agreed to "continue our deal," stating that Hester would make more phone calls: "[H]e was really wanting to look elsewhere to try to fulfill the order, and he wanted some more time to do that."

7

They exchanged further text messages, including negotiating over the price for the "quarter" of methamphetamine, with Detective Haunschild at one point offering $150 for the drugs. Hester replied, "Lol. Get out of here. I'll make 550 off that before 12:00 o'clock tonight." Haunschild testified that, in his experience, this meant that Hester "was going to break it down so that he could make more money off of it versus selling it to me raw." The negotiations by text message then broke down, and Hester and Haunschild were unable to reach a deal.

Detective Haunschild testified that "shortly thereafter" he contacted Montgomery. After overhearing part of the phone conversation between Hester and Montgomery, Haunschild thought that Montgomery might be able to fill the order. On July 11, 2017, Haunschild met with Montgomery at the Brunwick house and asked him if he could get him a half ounce of methamphetamine. Montgomery told Detective Haunschild that he could and told Haunschild to get back in touch with him. Montgomery gave Haunschild his phone number. Detective Haunschild used the phone number to text Montgomery, who told Haunschild he was "checking on it." Haunschild understood this to mean that Montgomery was trying to get the requested half ounce of methamphetamine. They negotiated a little more but were ultimately unable to complete the deal. Detective Haunschild testified that the deal fell through because Montgomery wanted to be paid up front before procuring the drugs for Haunschild, and Haunschild would not agree to that.

8

At this point, the investigation into the Brunswich house ended. Detectives subsequently obtained a search warrant and arrested Hester, Lafrenz, and Montgomery. The jury ultimately convicted Hester of engaging in organized criminal activity with regard to selling narcotics.

## Authentication of Text Messages

In his first issue, Hester argues that the trial court erred in admitting, over Hester's objection, copies of the text messages between Detective Haunschild and Montgomery because the messages were not properly authenticated.

### A.    Standard of Review

To properly authenticate a piece of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a); *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). "Whether the proponent has crossed this threshold as required by Rule 901 is one of the preliminary questions of admissibility contemplated by Rule [of Evidence] 104(a)," and "[t]he trial court should admit proffered evidence "upon, or subject to the introduction of evidence sufficient to support a finding of authenticity." *Tienda*, 358 S.W.3d at 638. It is within the jury's purview to "determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that

9

the proffered evidence is authentic." *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015); *see Tienda*, 358 S.W.3d at 638. We review a trial court's threshold determination of authenticity under an abuse of discretion standard. *Butler*, 459 S.W.3d at 600; *see De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009) (stating that appellate courts review trial court's evidentiary rulings for abuse of discretion).

"As with other types of evidence, text messages may be authenticated by 'evidence sufficient to support a finding that the matter is what its proponent claims.'" *Butler*, 459 S.W.3d at 600–01 (quoting Tex. R. Evid. 901(a)). Authentication "can be accomplished in myriad ways," including "through the testimony of a witness with knowledge or through evidence showing distinctive characteristics." *Id.* at 601 (citing Tex. R. Evid. 901(b)(1), (4)).

While "evidence that merely shows the association of a phone number with a purported sender—alone—might be too tenuous," the Court of Criminal Appeals has held:

> A witness might also claim to have knowledge that a text message came from a phone number known to be associated with the purported sender. The association of a cell-phone number with a particular individual might suggest that the owner or user of that number may be the sender of a text message. Indeed, the suggestion may be quite strong. Unlike so-called "land lines," commonly utilized by an entire household, cell phones tend to be personal and user-specific.

*Id.*

10

The Court of Criminal Appeals further recognized that, "[a]s with evidence in general, authenticating evidence may be direct or circumstantial." *Id.* at 602. And it stated that when a sponsoring witness testifies to an association between a cell-phone number and a purported author, "other evidence may be available that might bridge the logical gap and permit a proper inference that the purported author sent the message." *Id.* at 601. This "other evidence" can include evidence of "the message's 'appearance, contents, substance, internal patterns, or other distinctive characteristics,' which considered in conjunction with other circumstances support a conclusion that a message indeed emanated from the purported author." *Id.* at 602 (quoting TEX. R. EVID. 901(b)(1)).

## B.    Analysis

At trial, when the State offered printed copies of text messages exchanged between Detective Haunschild and Lafrenz, Hester, and Montgomery, Hester objected on the basis that the messages were not properly authenticated.

Before introducing the messages into evidence, Detective Haunschild testified that he used a program designed "for police officers to spoof a number," explaining that the program "creates a number for you for whatever the area code you want." He further explained that he used the program to send messages and it "records everything—everything that happens, audio recording as well as text message recording." He testified that he used this program to contact Lafrenz,

11

Hester, and Montgomery from a city-owned cell phone, and the records of those messages were printed through the police "LETS system."

Regarding the text messages between himself and Montgomery, Detective Haunschild's testimony provided context for the exchange as part of the larger investigation. Detective Haunschild stated that, following his failed negotiation for a bigger purchase from Hester, he returned to the Brunswick house to contact Montgomery in person on July 11, 2017. Montgomery gave Haunschild his cell phone number during this in-person meeting, and they later exchanged text messages. The State sought to authenticate the text messages between Haunschild and Montgomery, relying on Detective Haunschild's identification of the messages based on his memory of the exchange. Detective Haunschild testified that the copies of the text messages between himself and Montgomery were obtained through the LETS system, and he identified the phone numbers as being the cell phone he used for undercover work and the one that Montgomery had given him in person. He further testified that he knew it was Montgomery he was texting with because "I told him I would get with him on my good number after speaking with him in person," referring to the content of the messages themselves as being consistent with the in-person meeting he had had with Montgomery. The trial court overruled Hester's objection that the messages had not been properly authenticated and admitted the text messages into evidence. The content of the messages

12

indicated that Haunschild and Montgomery attempted to set up a drug deal but were ultimately unsuccessful.

Hester argues that the State failed to authenticate the text messages between Detective Haunschild and Steve Montgomery when it produced evidence only of an association between the phone number and Montgomery, and, thus, the trial court erred in admitting the unauthenticated text messages. Hester cites the Court of Criminal Appeals' decision in *Butler* cautioning courts that mere evidence of an association between a phone number and a person is not sufficient to authenticate messages. He relies on the following passage from *Butler*: "Still, evidence that merely shows the association of a phone number with a purported sender—*alone*—might be too tenuous. We have advised caution in the event a trial court finds that this is the *only* fact underlying a witness's knowledge linking a text message to a purported author." *Butler*, 459 S.W.3d at 601 (emphasis in original).

Here, however, there was more than a mere association between Montgomery and the phone number in question. Not only did Detective Haunschild identify the number as being the one he was given in person by Montgomery, but he relied on his own memory of having engaged in the text messaging with Montgomery. Haunschild testified that he knew he was texting with Montgomery because the content of the messages themselves was consistent with his previous in-person conversations with Montgomery. *See Butler*, 459

S.W.3d at 601 (holding that authentication "can be accomplished in myriad ways," including "through the testimony of a witness with knowledge or through evidence showing distinctive characteristics"). Detective Haunschild asked Montgomery in person at the Brunswick house whether Montgomery could obtain the amount of methamphetamine that he was hoping to buy, and the two men continued that conversation by text message until it was clear that a deal could not be reached. Detective Haunschild's testimony establishes that the content of the messages themselves, including the terms and language used, was consistent between their in-person meeting and their subsequent text messages. *See id.* at 602 (identifying "other evidence" that may "bridge the logical gap" as including evidence of "the message's 'appearance, contents, substance, internal patterns, or other distinctive characteristics,' which considered in conjunction with other circumstances support a conclusion that a message indeed emanated from the purported author").

The jury rationally could have chosen to believe Detective Haunschild's testimony regarding the text message exchange in determining that the messages were what the State claimed they were—text messages exchanged between Detective Haunschild and Montgomery in a failed negotiation for the sale of methamphetamine. *See id.* at 600–01 (holding that text messages may be authenticated by evidence sufficient to support finding that matter is what its proponent claims). Accordingly, the trial court's decision to admit the text

14

messages and leave the ultimate question of the weight and credibility of the evidence to the jury was well within the zone of reasonable disagreement. *See id.* at 600, 605 (holding that jury must "determine whether an item of evidence is indeed what its proponent claims" and that "the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic").

We overrule Hester's first issue

## Sufficiency of the Evidence

In his second issue, Hester argues that the evidence was insufficient to establish a "combination" as required to support his conviction for engaging in organized crime.

### A. Standard of Review

In conducting a legal sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014). We defer to the factfinder to resolve conflicts, weigh the evidence, and draw reasonable inferences. *Whatley*, 445 S.W.3d at 166 ("This 'familiar standard gives full play to the responsibility of the

trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" (quoting *Jackson*, 443 U.S. at 319)). We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *Id.*; *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

"[D]irect evidence of the elements of the offense is not required." *Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence, and juries are permitted to make reasonable inferences from the evidence presented at trial and in establishing the defendant's guilt. *Id.* at 14–15. "Circumstantial evidence alone can be sufficient to establish guilt." *Id.* at 15. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014); *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

A person commits the offense of engaging in organized criminal activity "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination . . . the person commits or conspires to commit one of more of the following [enumerated predicate offenses]." TEX. PENAL CODE § 71.02(a). Relevant here, section 71.02(a) recognizes the "unlawful manufacture, delivery, dispensation, or distribution of a controlled substance or dangerous drug,

16

or unlawful possession of a controlled substance or dangerous drug through forgery, fraud, misrepresentation, or deception" as a predicate offense. *Id.* § 71.02(a)(5).

"Engaging in organized criminal activity is a 'circumstances of the conduct" offense, the circumstances being the existence or creation of a combination that collaborates in carrying out criminal activities." *O'Brien v. State*, 544 S.W.3d 376, 384 (Tex. Crim. App. 2018). For purposes of engaging in organized criminal activity:

> "Combination" means three or more persons who collaborate in carrying on criminal activities, although:
>
> > (1) participants may not know each other's identity;
> >
> > (2) membership in the combination may change from time to time; and
> >
> > (3) participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations.

TEX. PENAL CODE § 71.01(a). "Conspires to commit" means that "a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement." *Id.* § 71.01(b). Furthermore, "[a]n agreement constituting conspiring to commit may be inferred from the acts of the parties." *Id.*

In considering the meaning of the phrase "collaborate in carrying on criminal activities" as used in the statutory definition of "combination," the Court of Criminal Appeals held that "the State must prove more than that the appellant committed or conspired to commit one of the enumerated offenses with two or more people," and that "something more" is "continuity." *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999); *see O'Brien*, 544 S.W.3d at 389–90 (noting that use of plural "activities" implies that combination at issue must do more than one thing). "[I]n other words, [the State must prove] that the appellant and two or more people agreed to 'work together in a continuing course of criminal activities.'" *Nguyen*, 1 S.W.3d at 697. However, the Court of Criminal Appeals has "rejected the argument that the proof of an intent to engage in a continuing course of criminal activities required a showing of a series of criminal acts." *O'Brien*, 544 S.W.3d at 390. "To convict of engaging in organized criminal activity, it is enough to show the collaboration to commit criminal activities including the commission of one of many possible offenses; the focus is upon the collaboration, not upon which offense is committed." *Id.* Similarly, to prove an "intent to establish, maintain, or participate in a combination or in the profits of a combination," the State must "show that the predicate offense was committed as part of a collaboration of three or more people working together in a continuing course of criminal activities." *Id.* at 391.

18

For purposes of establishing delivery of a controlled substances, "deliver" means "to transfer, actually or constructively, to another a controlled substance, counterfeit substance, or drug paraphernalia, regardless of whether there is an agency relationship." TEX. HEALTH & SAFETY CODE § 481.002(8). The term "includes offering to sell a controlled substance." *Id.*

## B.    Analysis

Hester was charged with committing the offense of delivery of controlled substance "with intent to establish, maintain or participate in a combination or in the profits of a combination, said combination consisting of JAMES LAFRENZ and STEVEN WAYNE MONTGOMERY." Thus, the State had to prove beyond a reasonable doubt that Hester delivered a controlled substance to Detective Haunschild as part of a collaboration with Lafrenz and Montgomery working together in a continuing course of criminal activities.

The State presented evidence, through the testimony of Detective Haunschild, testimony of other investigating officers, the text messages, and the actual drugs purchased by detectives that Hester, Lafrenz, and Montgomery all sold or offered to sell methamphetamine to Detective Haunschild. The evidence indicated that Hester, Lafrenz, and Montgomery knew each other and worked together to make the drug sales. When Lafrenz was unable to provide the amount of drugs Haunschild sought to buy, he contacted his "dealer," Hester. When Hester

was attempting to find a source for the even larger amount of drugs Haunschild requested, he contacted Montgomery. Montgomery himself at one point offered to procure the drugs Haunschild had requested. This evidence was sufficient for the jury to infer that Hester, acting with "the intent to establish, maintain, or participate in a combination" with Lafrenz and Montgomery, committed the offense of delivery of a controlled substance. *See* TEX. PENAL CODE § 71.02(a); TEX. HEALTH & SAFETY CODE § 481.002(8).

Hester acknowledges in his brief that the evidence of the various drug transactions between Detective Haunschild, Lafrenz, and Hester "is sufficient to allow an inference that Hester intended to engage in drug sales with Lafrenz," but he argues that there was no evidence that Hester and Montgomery intended to engage in a continuing course of criminal activities. Hester argues that he "is not alleged to have ever said anything to Steve Montgomery" and that Montgomery never participated in the drug sale between Hester and Detective Haunschild except to the extent that he was "simply existing in his own apartment during a time when his roommate and Hester sold drugs to an undercover officer." Hester argues that "[n]o evidence exists, other than the fact of living together, that Steve Montgomery was involved in any way with the ongoing criminal behavior [of] James Lafrenz."

The evidence indicates, however, more than Montgomery's mere presence during a single drug sale. Detective Haunschild testified that, during the sale on June 29, Montgomery was present and seemed to be aware of what was happening with the drug sale. Haunschild further testified that, on July 7, 2017, while he was driving Hester around Seabrook, Hester called Montgomery in an attempt to fulfill Haunschild's request for a quarter of an ounce of methamphetamine. Haunschild then contacted Montgomery in person and through text message, and during these conversations, Montgomery offered to sell methamphetamine to Haunschild before the deal ultimately fell apart. This is sufficient to establish that Hester, Lafrenz, and Montgomery committed the predicate offense of delivery of a controlled substance as part of a collaboration in a continuing course of criminal activity. *See* TEX. HEALTH & SAFETY CODE § 481.002(8) (providing that term "deliver" includes "offering to sell a controlled substance"); *O'Brien*, 544 S.W.3d at 391.

Hester also asserts that "the evidence is only sufficient to prove that in this criminal episode, Hester intended to work with Lafrenz to facilitate the delivery of the controlled substance to [Detective] Haunschild." Hester's evaluation of the "criminal episode" narrowly focuses on the June 29 drug sale, when Haunschild purchased an "eight-ball" of methamphetamine from Hester at Lafrenz and Montgomery's home. This limited view of the criminal activity alleged in this case is undermined by the evidence before the jury—the jury learned of multiple drug

21

sales or attempts to sell drugs that involved Lafrenz, Hester, and Montgomery at various times. There was also evidence that all three were aware of and worked together to make the drug sales. When Hester arrived to sell Detective Haunschild the "eight-ball," Hester was very comfortable in Lafrenz and Montgomery's house. He entered before waiting for anyone to answer his knock and knew his way around the home. Haunschild testified that Montgomery appeared to be aware of what was happening during the drug sale. Detective Haunschild further testified that, on July 7, while Hester was attempting to procure a quarter of an ounce of methamphetamine for Haunschild, he spoke to Montgomery on the phone and otherwise indicated that Montgomery was a potential source for obtaining the drugs. Montgomery later offered to obtain the drugs Haunschild wanted to purchase, but the deal was never completed because Montgomery wanted Haunschild to provide the money before receiving the drugs and Haunschild would not agree to that arrangement.

Hester further argues that no other physical evidence, such as "ledgers or notebooks with numbers or deals" or "marked money," indicated that Hester was working in combination with Lafrenz and Montgomery. Such evidence is not required. Rather, the State must provide evidence of Hester's "intent to establish, maintain, or participate in a combination or in the profits of a combination" by committing the offense of delivery of a controlled substance "as part of a

collaboration of three or more people"—here, specifically with Lafrenz and Montgomery—working together "in a continuing course of criminal activities." *See* TEX. PENAL CODE § 71.02(a); *O'Brien*, 544 S.W.3d at 391. The State could prove these elements through circumstantial evidence, and the jury was permitted to make reasonable inferences from the evidence presented at trial in establishing Hester's guilt.[2] *See Hooper*, 214 S.W.3d at 14–15.

Accordingly, we conclude that a rational jury could have determined beyond a reasonable doubt that Hester engaged in organized criminal activity. *See See* TEX. PENAL CODE § 71.02(a); *Jackson*, 443 U.S. at 319.

We overrule Hester's second issue.

---

[2] Hester also argues that the State's insufficient evidence was "bolstered" by a misleading argument made by the State during closing statements. During closing arguments, the State mistakenly referred to text messages as having been exchanged between Hester and Montgomery, rather than between Detective Haunschild and Montgomery. Hester's counsel, however, failed to object to this statement by the State, and, thus, any error with regard to this statement is waived. *See* TEX. R. APP. P. 33.1(a). And in light of the other evidence recounted above, including Detective Haunschild's testimony clearly identifying the text messages as having been exchanged between himself and Montgomery, we conclude that this one statement during closing arguments does not undermine our conclusion that a rational jury could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

**Conclusion**

We affirm the judgment of the trial court.


Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.

Publish. TEX. R. APP. P. 47.2(b).