

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0456-14

**BILLY DEAN BUTLER, Appellant**

**v.**

**THE STATE OF TEXAS, Appellee**

## ON STATE'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE THIRTEENTH COURT OF APPEALS
## BEE COUNTY

YEARY, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, KEASLER, HERVEY, ALCALA, RICHARDSON and NEWELL, JJ., joined. JOHNSON, J., concurred in the result.

## O P I N I O N

Appellant was convicted of the aggravated kidnapping of his girlfriend, Ashley Salas. On direct appeal, he complained that the trial court admitted certain text messages into evidence that Appellant claimed were not properly authenticated. The State introduced the text messages through Salas, who testified that she recognized Appellant's phone number displayed on the text messages, that the text messages were from Appellant, and that

Appellant even called her from that phone number at some point during the course of their text messaging back and forth.

Relying upon this Court's opinion in *Tienda v. State*, 358 S.W.3d 633 (Tex. Crim. App. 2012), the Corpus Christi Court of Appeals held that Salas's testimony did not adequately serve to authenticate the text messages. *Butler v. State*, No. 13-12-00608-CR, 2014 WL 1272232, at *4 (Tex. App.—Corpus Christi Mar. 27, 2014) (not designated for publication). Finding that the trial court erred by admitting the text messages and that their admission into evidence was not harmless, the court of appeals reversed Appellant's conviction. *Id*. at *4-6. Justice Perkes dissented. *Id.* at *6-7. We granted the State's petition for discretionary review in order to examine the court of appeals's application of our holding in *Tienda*, and we now reverse.

## BACKGROUND

Salas testified that, as of August 18 of 2011, she and Appellant had been living together for four or five months in a house in Beeville. That morning Salas received a phone call from her grandmother in nearby Kenedy, who was undergoing cancer treatment and did not expect to live for long. Salas decided to drive to Kenedy to join other family members in visiting her grandmother.

Appellant was unhappy with Salas's decision to visit her grandmother, and he began to harass her on her mobile phone, calling and texting her repeatedly from the time she left the house and continuing throughout the afternoon and into the evening. He accused her of

using the family visit as a cover for infidelity. At about 9:00 o'clock, Salas heard her car start outside, and she saw Appellant drive it away. Appellant immediately sent Salas a text message to say that she could find her car on the side of the highway. When Salas later returned with her mother to Beeville, she found her car and drove it to her mother's house, arriving at about 11:00 o'clock. Appellant found Salas there and apologized profusely, eventually persuading her to return to their home.

On the drive back to their house, Appellant once again accused Salas of infidelity and began to strike her. When she tried to exit the car, he restrained her by her hair. Once back at the house, Appellant pushed Salas inside and demanded to know the identity of her lover. He tore her clothes off and began to punch her and pull her hair. He would not let her leave the house, and for the rest of the night he continued intermittently to interrogate, threaten, berate, smother, strangle, kick, and otherwise batter her until she eventually fell asleep at around daylight. When she awoke later that morning, Appellant acted as if he did not know what had happened to her. Salas's mother came in the afternoon and called an ambulance to take her to the hospital. A police detective photographed the numerous abrasions and contusions on Salas's face and body. Appellant was then arrested and charged with aggravated kidnapping.[1]

Prior to trial, Salas gave a written statement to Appellant's attorney in which she

---

[1] *See* TEX. PENAL CODE § 20.04(a)(3), (4), (5) ("A person commits an offense if he intentionally or knowingly abducts another person with the intent to . . . facilitate the commission of a felony or . . . inflict bodily injury on him or . . . terrorize him[.]").

provided a different account of the beating she had endured. She explained that she had arrived back at the house by herself only to find one of Appellant's friend's girlfriends and another woman sitting on the couch. Suspecting Appellant of infidelity, she attacked the women but suffered the worse for the encounter. On cross-examination, Salas admitted to making the written statement, but she denied that it was truthful, explaining that Appellant had persuaded her to concoct this alternative story several months after the incident when she discovered she was pregnant with his child.

The week before trial began, Appellant and Salas shared an exchange of text messages in which, Salas believed, Appellant threatened "to come and hurt [her] or [her] family" should she testify against him. The State offered State's Exhibit 57, encompassing a number of photographs of the text messages taken from Salas's Blackberry. The text messages, spanning a period of about eight minutes, read:[2]

| 3612153899: | *And add this cuz ur fon is taped that y u tex I'll kill u myself bitch* |
| 3612153899: | *Pipe in ur mouth ho* |
| 3612153899: | *I can't wait your teeth r going in ur throat* |
| Salas: | *Ok I said it once versus u sayin it over 10 times ok mmm wat u Don't b a pussy tell me* |
| 3612153899: | *Snithin ass bitch ur dead I hope u lived it out cuz ur scum snitching bitching ass* |

---

[2] The text messages are set forth in italics here because they were set out in their original form in italics.

3612153899:     *I'll start with ur mono first*

Salas:          *Who I can't understand ur writing*

3612153899:     *Ur the pussy u run to the cops after u fuck me over*

3612153899:     *Shut up bitch*

Salas:          *And wat??*

Salas:          *Have some balls & take responsibly for your own ACTIONS*

Salas:          *U did the crime*

3612153899:     *They sent u in there to take pics of me*

3612153899:     *U deserved it*

Salas:          *I deserved wat*

3612153899:     *Liers need that*

3612153899:     *Lmfao*

3612153899:     *Everyone counted*

The trial court admitted this exhibit over Appellant's objection that, among other things, the "proper predicate" was lacking.

The State offered the text messages after laying the following predicate through Salas's testimony:

      Q.     What is [Appellant's] phone number?

      A.     361-215-3899.

      Q.     Does that number appear on all the pages of the exhibit?

A.    Yes.

Q.    How do you know that that is [Appellant's] telephone number?

A.    Because that's where he called me from and that's what's on the same exhibit in front of me.

Q.    You've read the text messages in the exhibit?

A.    Yes.

Q.    Who sen[t] you those text messages?

A.    He did.

Q.    How do you know that it was him?

A.    Because he was the one texting me back and forth and he had even called in between the conversations talking mess.

The jury found Appellant guilty. Appellant pled true to one enhancement count for a prior aggravated assault, and the trial court assessed his punishment at fifty years' confinement in the penitentiary and a fine of $10,000.

On appeal, the court of appeals found the State's predicate inadequate to establish that Appellant was the author of the text messages attributed to number 361-215-3899. Even Salas's testimony that Appellant had called her "in between the conversations talking mess" failed, in the eyes of the court of appeals, to "provide a sufficient link between [Appellant] and the text messages to warrant the ultimate submission of the text message transcript to the jury." *Butler*, 2014 WL 1272232, at * 4. The court of appeals elaborated:

> If the State sought to authenticate the text messages solely through Salas, rather than through the cellular phone company or any other means, it could

have done so by further developing Salas's testimony to include other circumstantial evidence that would have linked [Appellant] to the text messages or to the telephone that was used to send the messages, such as whether [Appellant] identified himself, how she knew it was [Appellant] calling, or how she recognized his voice.

*Id*.

## THE LAW OF AUTHENTICATION

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." TEX. R. EVID. 901(a). In a jury trial, it is the jury's role ultimately to determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic. *Tienda*, 358 S.W.3d at 638. The trial court's determination of whether the proponent has met this threshold requirement is subject to appellate review for an abuse of discretion and should not be countermanded so long as it is within the zone of reasonable disagreement. *Id*. This has been aptly described as a "liberal standard of admissibility." Cathy Cochran, TEXAS RULES OF EVIDENCE HANDBOOK 922 (7th ed. 2007-08).

## CELL PHONE TEXT MESSAGES

Text messages are "short messages [sent] over a cellular phone network, typically by means of a short message service (SMS)." Steven Goode, *The Admissibility of Electronic Evidence*, 29 REV. LITIG. 1, 16 n.66 (Fall 2009). As with other types of evidence, text

messages may be authenticated by "evidence sufficient to support a finding that the matter is what its proponent claims." TEX. R. EVID. 901(a). This can be accomplished in myriad ways, depending upon the unique facts and circumstances of each case, including through the testimony of a witness with knowledge or through evidence showing distinctive characteristics. TEX. R. EVID. 901(b)(1) (testimony of a witness with knowledge); TEX. R. EVID. 901(b)(4) (distinctive characteristics and the like); *see, also* Goode, *supra*, at 16-19, 31-33.

A witness might have "knowledge" of the authorship of a text message for a number of reasons. One reason might be that the witness is the actual author of the text message. *Tienda*, 358 S.W.3d at 640. Another reason might be that the witness personally observed the purported author actually type and/or send the message. *Id*. A witness might also claim to have knowledge that a text message came from a phone number known to be associated with the purported sender. The association of a cell-phone number with a particular individual might suggest that the owner or user of that number may be the sender of a text message. Indeed, the suggestion may be quite strong. Unlike so-called "land lines," commonly utilized by an entire household, cell phones tend to be personal and user-specific.[3]

---

[3] Both the United States Supreme Court and this Court have lately recognized that cell phone users can have a reasonable expectation of privacy in the content of their cell phones, noting the plethora of highly personal information that may be found there—suggesting a certain unique relationship between owner and cell phone. *See Riley v. California*, 134 S.Ct. 2473, 2489 (2014) ("The term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers."); *State v. Granville*, 423 S.W.3d 399, 417 n.66 (Tex.

Still, evidence that merely shows the association of a phone number with a purported sender—*alone*—might be too tenuous. We have advised caution in the event a trial court finds that this is the *only* fact underlying a witness's knowledge linking a text message to the purported author.[4] A logical gap may still exist—a gap that we can recognize by reason and common sense—because, as we recognized in *Tienda*, "cell phones can be purloined,"[5] and a cell-phone number does not necessarily establish the identity of the user at a particular moment in time with the same definitiveness that fingerprints, signatures, photographs, or DNA may establish the identity of the perpetrator of a crime.

In isolation, a cell phone number is in some respects similar to a return address on a letter. If the return address is the location where the purported author happens to live, it may suggest that the person who lives at the address is the author of the letter. Or it might not—at least not on its own, if multiple people happen to live at or have access to that same address. But a letter bearing the return address of a purported author, combined with other

---

Crim. App. 2014) (noting the different relationship people have with their phones than they did in the past). Along the way, the Supreme Court remarked that cell phones "place vast quantities of personal information literally in the hands of individuals" and "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley*, 134 S.Ct. at 2484-85. "Now it is the person who is not carrying a cell phone, with all that it contains, who is the exception. According to one poll, nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12 % admitting that they even use their phones in the shower." *Id*. at 2490. Any parent or teacher can confirm how difficult it can be to separate a teenager from his cell phone.

[4] Mindful that "cell phones can be purloined[,]" we observed in *Tienda* that, the fact "that a text message emanates from a cell phone number assigned to the purported author . . . without more," might be "[in]sufficient to support a finding of authenticity." 358 S.W.3d at 641-42.

[5] *Id*. at 641.

circumstances including its appearance and contents, may be sufficient to authenticate a letter as having been sent by the person purported to be its author.[6]

As with evidence in general, authenticating evidence may be direct or circumstantial.[7]

---

[6] *See, e.g., United States v. Thompson*, 449 F.3d 267, 274-275 (1st Cir. 2006)(finding an anonymous letter properly admitted as an admission of the defendant where the sponsoring witness testified that the return address was known to him to be the address of the defendant and other circumstances tended to suggest that the letter had been written by the defendant); *State v. Brown*, 783 N.E.2d 539, 548-549 (Ohio. App. 2002) (finding a letter properly authenticated as having been authored by the defendant after observing that the return address on the letter was the same county jail where the defendant was incarcerated, along with a number of other factors, such as the date the letter was written, the fact that it was addressed to the judge presiding over the defendant's trial, the fact that it mentioned that a hearing that was scheduled in the case did not take place when it was scheduled, the fact that it discussed the defendant's history in the correctional system, and the fact that it was signed with the defendant's name).

As the Tyler Court of Appeals has also observed:

> Another traditional method of authentication permitted by Rule 901 is the "reply-letter doctrine." *Varkonyi v. State*, 276 S.W.3d 27, 35 (Tex. App.—El Paso 2008, *pet. ref'd*) (citing Cathy Cochran, TEXAS RULES OF EVIDENCE HANDBOOK, Article IX, at 915 (6th ed. 2005). Under this doctrine, a letter received in the due course of mail purportedly in answer to another letter is prima facie genuine and admissible without further proof of authenticity. *Id*. This doctrine applies to e-mails. *Id*. Therefore, an e-mail is sufficiently authenticated when a person responds to an e-mail that was sent to the person's e-mail address. *Id*. This rule has been applied to other types of messages by analogy. *See, e.g.*, *People v. Pierre*, 41 A.D.3d 289, 838 N.Y.S.2d 546, 548-49 (N.Y.App.Div. 2007) (applied to instant message where person sent instant message to screen name and received reply, content on reply supported conclusion that message was sent by defendant, and no evidence was admitted to show anyone else had motive or opportunity to impersonate defendant by using his screen name).

*Manuel v. State*, 357 S.W.3d 66, 75-76 (Tex. App.—Tyler 2011, *pet. ref'd*).

[7] *See Wallace v. State*, 782 S.W.2d 854, 858 (Tex. Crim. App. 1989) (finding that "the predicate for admission of audio tapes may be proven with circumstantial evidence"); *and see also, e.g., United States v. Haldeman*, 559 F.2d 31, 107 (D.C. Cir. 1976) (en banc) ("Although the evidence bearing on admissibility should be carefully scrutinized to see if it measures up . . . it may be circumstantial or direct, real or testimonial, and need not conform to any particular model.").

In cases where a sponsoring witness may testify to an association between a cell-phone number and a purported author, other evidence may be available that might bridge the logical gap and permit a proper inference that the purported author sent the message. The other evidence might include the message's "appearance, contents, substance, internal patterns, or other distinctive characteristics," which considered in conjunction with other circumstances support a conclusion that a message indeed emanated from the purported author. TEX. R. EVID. 901(b)(1).

For example, a cellular-phone company may provide records to show that a text message originated from the purported sender's phone "under circumstances in which it is reasonable to believe that only the purported sender would have had access to the . . . cell phone." *Tienda*, 358 S.W.3d at 640. In other cases, the purported sender of a message may respond in such a way as to indicate his or her authorship of the message, such as by calling the recipient to confirm receipt of the message. *Id*. at 641. And in still other cases, the content and/or context of a particular exchange of messages may create an inference supporting the conclusion that it was in fact the purported author who sent them. See *Id*. at 641 & n.34.[8]

## ANALYSIS

In the instant case, Salas testified that the text messages at issue emanated from phone number 361-215-3899. She had personal knowledge that this was Appellant's phone number,

---

[8] *See also, Massimo v. State*, 144 S.W.3d 210 (Tex. App. - Forth Worth 2004, *no pet.*) (in an electronic communications harassment case, addressing both circumstances and content related factors, such as the fact that the offending email was sent shortly after an altercation between the defendant and the victim and referenced the altercation).

presumably from past experience. The court of appeals believed that the State's predicate failed to establish any more than the bare fact that the text messages emanated from Appellant's personal phone. *Butler*, 2014 WL 1272232 *4 ("Salas's testimony states that she had personal knowledge that it was Butler's telephone number because he had called her from that number before. This testimony, without more, is exactly the type of evidence that the *Tienda* Court warned about in authenticating text messages."). It concluded there was insufficient accompanying indicia of Appellant's authorship. *Id.* In our view, however, there was other evidence that bridged the gap and supplied the necessary predicate.

Asked how she knew it was Appellant's number, Salas replied: "[b]ecause that's where he called me from[.]" But how did she know that it was Appellant who was using that phone to send her the particular text messages at issue in this case? According to Salas, "Because he was the one texting [her] back and forth *and he had even called in between the conversations talking mess*."[9] Although Salas's responses are not without ambiguity, a rational jury could conclude that Salas recognized the texts to be coming from Appellant on this occasion (and not someone else who might have purloined his phone) because: (1) he had called her from that number on past occasions; (2) the content and context of the text messages convinced her that the messages were from him; and (3) he actually called her from that same phone number during the course of that very text message exchange.

Aside from the fact that appellant had called Salas in the past from phone number

---

[9] Emphasis added.

361-215-3899, the content and context of the text messages themselves constituted additional circumstantial evidence of the authenticity of the messages. *See* TEX. R. EVID. 901(b)(4) (distinctive characteristics and the like). When considering the admissibility of text messages, just as when considering the admissibility of letters, emails, instant messages, and other similar written forms of communications, courts must be especially cognizant that such matters may sometimes be authenticated by distinctive characteristics found within the writings themselves and by comparative reference from those characteristics to other circumstances shown to exist by the evidence presented at trial.[10] Conversations and events that precede or follow the communications at issue, when identified or referred to within the written communication, can provide contextual evidence demonstrating the authenticity of such communications.[11]

Take, for example, the text-message exchange in this case, which occurred the week before Appellant's trial began. One particular text message sent from Appellant's phone during the exchange stated: "Snithin ass bitch ur dead I hope u lived it out cuz ur scum snitching bitching ass." Appellant certainly had a reason to consider Salas a "snitch" since

[10] Cathy Cochran, TEXAS RULES OF EVIDENCE HANDBOOK 934 (7th ed. 2007-08) ("[T]he language of the rule . . . obviously is aimed at permitting items to be authenticated by distinctive circumstantial evidence, [and t]hus, letters and other items may be authenticated by distinctive characteristics such as the document's contents, appearance, and location.").

[11] *See id.*, at 936 ("Factors to consider in determining the authenticity of e-mails and instant messages include . . . (6) any other circumstances, such as conversations or events either before or after the e-mail or instant message that tend to make it more likely that this message came from a certain person.").

she was likely going to be the principal witness against him at his upcoming trial. Similarly, Appellant had a motive to try to prevent her from testifying against him at his trial by making threats to both her and her family. The record fails to suggest anybody else who might have had a similar motive to threaten Salas and her family in the week before Appellant's trial began.[12]

What's more, another of the text messages indicated a belief that the recipient of the message had complained about the sender to the police. Specifically, this message stated: "Ur the pussy u run to the cops after u fuck me over." Who else other than Appellant might have complained—one week before appellant's trial—that Salas had "fuck[ed] [him] over" and "run to the cops"? A rational inference is certainly available under the circumstances that Appellant was the author of these profane and threatening text messages.

Finally, it is at least implicit in Salas' ultimate response (to the question: "How do you know that it was him?") that she knew it was Appellant who was texting her from his phone because of a contemporaneous call she received from a person whose voice she recognized to be Appellant's. She testified that "he had even called in between the conversations talking mess." The timing of that phone call ("in between the conversations") is yet another

---

[12] *See* Honorable Paul W. Grimm, Lisa Yurwit Bergstrom & Melissa M. O'Toole-Loureiro, *SYMPOSIUM: Keynote Address: Authentication of Social Media Evidence*, 36 AM. J. TRIAL ADVOC. 433, 458 (Spring 2013) ("When all that the objecting party offers is speculation or conjecture about who, other than the putative creator, 'could' have created the evidence, such questions are properly left to the jury in determining how much weight, if any, to give to the evidence -- provided that the trial judge is convinced that the proponent has met the relatively low threshold required by Rule 901(a) of producing facts that would be sufficient for a reasonable jury to conclude that the evidence was created by the putative creator.").

circumstance which made it reasonable for Salas (and hence, the jury) to conclude that Appellant was the person who controlled the phone at the time that the text messages at issue were generated.

The State could have endeavored to make all of these circumstantial indicia of authenticity more explicit and less ambiguous than it did. However, under the circumstances presented in this case, we cannot agree with the court of appeals that the trial court abused its discretion to conclude that there was sufficient evidence to support a jury finding that the text messages were indeed what the State and Salas purported them to be—namely, a text-message exchange between Salas and Appellant.

Appellant insists that, because Salas's credibility was seriously impeached by the fact that she had given a statement implicating someone other than Appellant in the beating she endured,[13] the trial court erred to conclude her testimony could be relied upon to establish his authorship of the text messages. We disagree. Rule 901 provides for authentication "by evidence sufficient to support a finding that the matter is what its proponent claims." TEX. R. EVID. 901. It requires merely "sufficient" evidence "to support" authentication. It does not

---

[13] Indeed, the trial judge observed (out of the jury's presence):

> And this -- this witness is something else.

> She's already made two completely different stories under oath as to what happened.
>
> * * *
>
> She's -- she's acting rather bizarrely for a witness that's supposed to come in that's been beaten up.

ordinarily require the trial court to make a threshold determination of the credibility of the evidence proffered by the proponent to establish authenticity. And as particularly applied to Rule 901(b)(1), it does not contemplate that, as a condition of admissibility, the trial court should have to find that the "witness with knowledge" is necessarily worthy of belief. TEX. R. EVID. 901(b)(1).

Nothing in Rule 901 suggests that a witness whose credibility has been questioned in some way is precluded by that fact from sponsoring evidence as a "witness with knowledge." *Id.* Even when a trial court judge *personally* harbors some doubt as to the general credibility of a sponsoring witness, a decision to admit particular evidence sponsored by that witness may not necessarily be outside the zone of reasonable disagreement.[14] So long as the ultimate fact-finder could rationally choose to believe the sponsoring witness, and the witness's testimony would establish that the item proffered "is what its proponent claims[,]" the trial court will not abuse its discretion to admit it.[15] As we said in *Tienda*, "[t]he ultimate question whether an item of evidence is what its proponent claims [is] a question for the fact-

---

[14] *Tienda*, 358 S.W.3d at 638 ("If the trial court's ruling . . . is at least 'within the zone of reasonable disagreement,' a reviewing court should not interfere.").

[15] We do not discount a remote possibility that, under some yet unknown set of facts, the balance of the record may so irrefutably contradict a sponsoring witness's authentication testimony that it might be appropriate for the trial court to determine that no rational ultimate fact-finder could choose to believe the sponsoring witness's testimony. *Cf. Carmouche v. State*, 10 S.W.3d 323, 331-33 (Tex. Crim. App. 2000) (in the context of an appellate review of a motion to suppress, despite a reviewing court's usual deference to the fact and credibility determinations of the trial court as original fact-finder, the trial court could not rationally accept the testimony of a law enforcement officer whose testimony was conclusively refuted by the videotape taken from his patrol car). This is not such a case.

finder—the jury, in a jury trial." *Tienda*, 358 S.W.3d at 638.

In this case, the jury could have rationally chosen to believe Salas's testimony about the text message exchange, despite her equivocation with respect to the offense itself. Salas explained her equivocation at trial, and a rational jury might readily have accepted her explanation as credible. The jury might also have found her testimony about the text-message exchange to be reliable and therefore concluded that Appellant was the one and only author who composed the messages and the threats contained therein.[16] The trial court's decision to admit the content of the text messages and leave the ultimate question of authenticity to the jury was well within the zone of reasonable disagreement.

## CONCLUSION

Accordingly, we reverse the judgment of the court of appeals and remand the cause to that court to consider any other issues that were properly before the court.[17]

DELIVERED:        April 22, 2015
PUBLISH

---

[16] *See, e.g.*, *State v. Thompson*, 777 N.W.2d 617, 626 (N.D. 2010) ("Here, the district court heard sufficient evidence from the complainant, including the circumstances of that day and his knowledge of Thompson's cell phone number and signature on text messages, to authenticate the complainant's testimony about the text messages he received on October 31, 2008."); *People v. Chromik*, 946 N.E.2d 1039, 1056 (Ill. App. Ct. 2011) (citing *Thompson* to hold that text messages were properly authenticated by, among other things, the victim's testimony).

[17] Although Appellant brought only a single point of error on direct appeal, it appears he may have made more than one substantive argument. Having reversed the conviction on the basis of Appellant's argument with respect to authentication, the court of appeals found it unnecessary to address his alternative arguments that the text messages were also inadmissible because they were simply irrelevant, or inadmissible under Rules 403 and 404(b) of the Texas Rules of Evidence. *Butler*, 2014 WL 1272232, at *2 & *6 n.4.