

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00258-CR
No. 02-19-00259-CR

———————————————

WILLIAM CLINT CAIN, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court Nos. CR17-00503-CR, CR17-00504-CR

Before Birdwell, Bassel, and Womack, JJ.
Opinion by Justice Womack

## OPINION

### I. INTRODUCTION

A jury convicted William Clint Cain of continuous sexual abuse of a child and possession with the intent to promote child pornography. *See* Tex. Penal Code Ann. §§ 21.02(b), 43.26(e). He raises a single issue on appeal: whether the trial court erred by admitting allegedly unauthenticated copies of text messages he exchanged with the complainant, Anna.[1] But Cain did not preserve this authenticity challenge for review, and even if he had, the trial court did not abuse its discretion by admitting the text messages into evidence. We therefore affirm Cain's judgment of conviction for continuous sexual abuse of a child and—after correcting a clerical error sua sponte—affirm as modified Cain's judgment of conviction for possession with the intent to promote child pornography.

### II. BACKGROUND

According to his stepdaughter, Anna, Cain repeatedly sexually abused her over a two-year period. In addition to his in-person abuse, Cain also requested and received nude photographs of Anna's breasts via text message. After being charged, Cain pleaded not guilty to continuous sexual abuse of a child and possession with the intent to promote child pornography.

---

[1]We use aliases for minors to protect their privacy. *See* Tex. R. App. P. 9.10(a)(3); 2nd Tex. App. (Fort Worth) Loc. R. 7.

2

As relevant to this appeal, Anna, who was sixteen years old at the time of trial, testified about the contents of the text messages she had exchanged with Cain. Before the State offered the messages into evidence, Anna identified Cain in the courtroom and stated that he was her stepfather. She provided a timeline of Cain's sexual abuse, confirming that Cain first asked to see her breasts in 2015 when she was eleven or twelve years old. A few months after this initial request, when the rest of her family was asleep and she was in the living room with Cain, he "reached his hand under [her] shirt." Later, he began offering her money, and his abuse became increasingly frequent. Anna explained how Cain sent her text messages to try to make her feel guilty and to manipulate her into doing what he wanted. She also described the various acts of sexual abuse perpetrated on her by Cain.

The State then offered excerpts of the text messages between Anna and Cain as State's Exhibit 2. The trial court admitted the exhibit over Cain's objection. The court also admitted, as separate exhibits, magnified versions of some of the photos Cain and Anna exchanged via text—including photographs of Anna's breasts.[2]

The jury found Cain guilty of both continuous sexual abuse of a child and possession with the intent to promote child pornography, and it assessed his punishment for the offenses at twenty-five years' confinement and two years' confinement, respectively. The trial court entered judgments in accordance with the

---

[2]The State offered and the trial court admitted both censored and uncensored magnified versions of the pornographic photographs Anna sent Cain via text message.

verdicts. Approximately one week later however, the trial court modified Cain's promotion-of-child-pornography judgment to correct clerical errors.[3]

## III. DISCUSSION

On appeal, Cain claims that the trial court erred by admitting his text-message exchanges with Anna because, Cain argues, there was insufficient evidence that he was the author of the text messages Anna received. We reject Cain's authenticity challenge for two independently sufficient reasons: (1) Cain did not preserve his current challenge for review; and (2) even if he had, the trial court did not abuse its discretion because there was ample evidence that Cain authored the text messages sent from his phone.

---

[3]Cain's original promotion-of-child-pornography judgment was entered on June 6, 2019. The judgment was corrected on June 13, 2019, due to errors in the date of the offense and Cain's plea to the offense. *See* Tex. R. App. P. 23.1. Although the corrected June 13 judgment was entitled "Nunc Pro Tunc Judgment of Conviction by Jury," it was not a true judgment nunc pro tunc because it was entered while the trial court still had plenary power over the case. *See Williams v. State*, 603 S.W.3d 439, 442–43 (Tex. Crim. App. 2020) ("Nunc pro tunc orders or judgments generally are reserved for actions taken outside a trial court's plenary power, requiring a trial court to rely on its inherent authority to make the record reflect what previously and actually occurred during its plenary power." (quoting and reviewing language from this court's opinion in *Williams v. State*, No. 02-17-00001-CR, 2018 WL 3468458, at *4 (Tex. App.—Fort Worth July 19, 2018) (mem. op., not designated for publication), *aff'd*, 603 S.W.3d 439 (Tex. Crim. App. 2020))). Rather, the June 13 judgment was a corrected judgment, and we refer to it as such. *See* Tex. R. App. P. 23.1.

4

## A. Preservation

First and foremost, Cain's authenticity challenge fails because he did not preserve it for review.[4]

To preserve an error for appellate review, a party must make a timely and specific objection, and "[t]he point of error on appeal must comport with the objection made at trial." *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). To "determin[e] whether a complaint on appeal comports with a complaint made at trial, we look to the context of the objection and the shared understanding of the parties at the time" to evaluate whether the appellant "ma[d]e the trial court aware of the complaint." Tex. R. App. P. 33.1(a)(1)(A); *Clark*, 365 S.W.3d at 339.

Cain's authenticity complaint on appeal does not comport with the objection he made at trial. When the State offered Exhibit 2 into evidence, Cain took Anna on voir dire and asked her if she had personal knowledge as to "how information from [her] cell phone got transmitted over to State's Exhibit 2," questioning whether she "kn[e]w for certain that every word that's [in State's Exhibit 2] actually came from [her] phone." Cain's voir dire focused on the fact that Anna was not present when law enforcement extracted the text messages from her phone. He remarked, "There could have been a mistake in some of the electronic devices[;] you don't know, do

---

[4]Neither party has addressed the preservation issue. However, "issues of error preservation are systemic in first-tier review courts" such as ours. *Gipson v. State*, 383 S.W.3d 152, 156, 159 (Tex. Crim. App. 2012) (quoting *Menefee v. State*, 287 S.W.3d 9, 18 (Tex. Crim. App. 2009)); *see Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005).

5

you?" After establishing this context, Cain objected that "there ha[d] been no showing as to how what purport[ed] to be on her phone got on State's Exhibit No. 2."[5] The prosecutor expressed confusion as to whether "that is some sort of chain of custody objection" or an authenticity objection, but he responded on both grounds. The trial court did not expressly state how it understood Cain's objection; it simply overruled the objection and admitted State's Exhibit 2.

Even broadly construing Cain's trial objection based on the context, and even assuming the trial court understood the objection as an authenticity complaint rather than a chain-of-custody complaint,[6] Cain's trial objection is unrelated to the argument he now raises on appeal. At best, Cain's trial objection was that the paper printout constituting State's Exhibit 2 was not transferred from Anna's phone by a known, reliable process and thus could not be verified as an accurate, authentic reflection of the text messages stored in Anna's cell phone. *See* Tex. R. Evid. 901(b)(9) (listing, as

---

[5]Cain lodged a second objection to State's Exhibit 2, arguing that "a minor [could not] giv[e] consent to search a property [i.e., her phone] that belongs to another person." But this objection has not been re-urged on appeal.

[6]After State's Exhibit 2 was admitted, Cain objected to several related exhibits "based on the same objections [] made to State's . . . Exhibit 2." In doing so, Cain restated the ambiguous objection discussed above by arguing "there [wa]s no chain of custody between the phone and these documents that have been presented." The record thus indicates that Cain intended his objection to State's Exhibit 2 to be a chain-of-custody objection and not an authenticity objection. Nonetheless, because the trial court could have misunderstood Cain's initial, ambiguous objection to State's Exhibit 2 as an authenticity complaint rather than a chain-of-custody complaint, we address this possibility.

6

an example of evidence that satisfies the authentication requirement, "[e]vidence describing a process . . . and showing that it produces an accurate result"). But on appeal, Cain challenges his purported authorship of the text messages—as they appeared in Anna's phone—and he claims that even if the communications came from his phone number, the State did not prove that he was the actual author. The record contains no indication that the trial court, the State, or anyone else understood Cain's trial objection as a challenge to the messages' authorship. *See* Tex. R. App. P. 33.1(a)(1)(A). Cain's complaint on appeal thus fails to comport with the objection he made at trial. *See, e.g.*, *Camacho v. State*, 864 S.W.2d 524, 533 (Tex. Crim. App. 1993) (holding hearsay and relevancy objections did not comport with or preserve appellate argument that extraneous-offense evidence was inadmissible character evidence); *Bigon v. State*, Nos. 03-05-00692-CR & 03-05-00693-CR, 2006 WL 2852476, at *8 (Tex. App.—Austin Oct. 4, 2006) (mem. op., not designated for publication) (holding appellant's argument that there was insufficient evidence connecting him to the medical records did not comport with authenticity, hearsay, and chain-of-custody objections raised at trial), *aff'd*, 252 S.W.3d 360 (Tex. Crim. App. 2008); *cf. Chavezcasarrubias v. State*, No. 02-14-00418-CR, 2015 WL 6081502, at *1 (Tex. App.—Fort Worth Oct. 15, 2015, no pet.) (mem. op., not designated for publication) (holding appellant preserved authenticity argument even though he only expressly objected to hearsay because his voir dire of the sponsoring witness pertained to the text messages' authorship and the trial court cited the authentication requirements and

7

admitted the evidence "under Rule 901" when it overruled appellant's objection). Consequently, Cain has not preserved any error for review. *See Santellan v. State*, 939 S.W.2d 155, 171 (Tex. Crim. App. 1997); *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986).

## B. Admissibility

Yet, even if Cain had preserved his authenticity challenge for review,[7] the challenge would fail because the trial court did not abuse its discretion by admitting the text messages.

A "bedrock condition of admissibility" is that the proposed exhibit is "authentically what its proponent claims it to be." *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012); *see also* Tex. R. Evid. 901(a). But authenticity is ultimately a question for the jury; the trial court is merely the gatekeeper of the evidence and is charged with making a preliminary determination of authenticity. *Tienda*, 358 S.W.3d at 638. This preliminary determination is simply whether the proponent of the proffered evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence is authentic. *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015); *Campbell v. State*, 382 S.W.3d 545, 549 (Tex. App.—Austin 2012, no

---

[7]Specifically, Cain's authenticity challenge on appeal contends that "in attempting to authenticate the text messages, [Anna] testified only that she recognized her cell phone number and the number she believed to be [Cain's]" and that "[t]he record is void of any testimony corroborating [that he] was the actual sender of the text messages."

pet.); *see Gardner v. State*, No. 02-14-00459-CR, 2015 WL 4652718, at *2 (Tex. App.—

Fort Worth Aug. 6, 2015, pet. ref'd) (mem. op., not designated for publication) (citing

*Campbell* for the proposition that the test for authenticity "requires only a threshold

showing [of evidence] that would be sufficient to support a [jury] finding that the

matter in question is what its proponent claims"); *see also Jackson v. State*, Nos. 02-17-

00253-CR & 02-17-00254-CR, 2018 WL 3581002, at *2 (Tex. App.—Fort Worth

July 26, 2018, no pet.) (mem. op., not designated for publication) (describing the

preliminary authenticity determination as "not stringent").  We review a trial court's

determination of whether the proponent has met this threshold requirement for an

abuse of discretion and will not countermand it "so long as it is within the zone of

reasonable disagreement."  *Butler*, 459 S.W.3d at 600.

In the context of electronic messages, authenticity includes a subsidiary issue:

whether the messages were authored by the purported sender.  Although the trial

court's preliminary authenticity determination is a "low bar," evidence "that merely

shows the association of a phone number with a purported sender—*alone*—might be

too tenuous" to show authorship.  *Butler*, 459 S.W.3d at 601–02 (analogizing a cell

phone number to a return address on a letter); *Gardner*, 2015 WL 4652718, at *2; *see*

*Tienda*, 358 S.W.3d at 641–42 (observing that "cell phones can be purloined" and thus

evidence "that a text message emanates from a cell phone number assigned to the

purported author . . . without more . . . [i]s [in]sufficient to support a finding of

authenticity"); *Chavezcasarrubias*, 2015 WL 6081502, at *2.  To "bridge the logical gap"

9

and permit an inference that the person associated with a specific cell phone number authored and sent the text messages at issue, the proponent is generally required to offer additional direct or circumstantial evidence—such as testimony from a witness with knowledge, contextual details indicating authorship, or distinctive content in the substance of the messages themselves. *Butler*, 459 S.W.3d at 601–03; *see also* Tex. R. Evid. 901(b).

For example, in *Butler v. State*, the Court of Criminal Appeals held that the trial court had the discretion to admit text messages from the defendant to the State's primary witness based on authenticating testimony from that witness together with the content of the messages themselves. *Butler*, 459 S.W.3d at 604–06. There, the witness testified that the text messages came from a phone number she knew to be Butler's "[b]ecause that's where he called [her] from"—implying that Butler had used that phone number to call the witness on past occasions. *Id.* at 600, 603. The witness further testified that she knew Butler "was the one texting [her] back and forth" in part because "he had even called in between the conversations talking mess"— implying that Butler called her from the same cell phone sending her text messages, that she recognized Butler's voice on the phone, that she thus knew Butler possessed the phone around the time of their text-message exchange, and that the content and context of the texts convinced her that Butler authored the messages. *Id.* at 600, 603–04. Moreover, the Court noted that, "[w]hen considering the admissibility of text messages, . . . courts must be especially cognizant that such matters may sometimes be

10

authenticated by distinctive characteristics found within the writings themselves"; "[c]onversations and events that precede or follow the communications at issue, when identified or referred to within the written communication, can provide contextual evidence demonstrating the authenticity of such communications." *Id.* at 603–04. The Court observed that Butler's texts—which were sent the week before his trial—threatened the recipient and called her a "snitch" who had "run to the cops." *Id.* at 604. This content was consistent with Butler's situation and his awareness that the recipient would serve as the primary witness against him at trial; the record contained no evidence of "anybody else who might have had a similar motive to threaten [the witness] . . . in the week before [Butler's] trial began." *Id.* Although the Court chastised the State for failing "to make all of these circumstantial indicia of authenticity more explicit," it nonetheless held that the trial court was "well within the zone of reasonable disagreement" to admit the text messages based on this evidence. *Id.* at 604–06.

We applied *Butler* in *Chavezcasarrubias* and upheld the admission of allegedly unauthenticated text messages between Chavezcasarrubias and the complainant—a minor with whom he had engaged in sexual intercourse—based on the content of the messages and the testimony of the complainant. *Chavezcasarrubias*, 2015 WL 6081502, at *2. There, the complainant testified (1) "that she had witnessed Chavezcasarrubias [program] the phone number that the text messages were received from into her phone"; (2) "that the text messages [depicted in the exhibit] were a true and accurate

11

depiction of text messages between herself and Chavezcasarrubias"; (3) "that Chavezcasarrubias had previously given her accurate instructions on what to wear and where to be [for their in-person meetings] through text messages sent from this same number"; (4) "that she knew that the phone number belonged to Chavezcasarrubias because she had called him on it and recognized his voice when he answered"; and (5) "that the text messages contained information with which only she and Chavezcasarrubias would have been familiar"—namely, references to their romantic and sexual relationship. *Id.* This evidence was sufficient to support the trial court's preliminary authenticity determination. *Id.*

Likewise, in *Jackson*, we applied *Butler* and upheld the authentication and admission of text messages that the defendant had exchanged with a minor female he had sexually assaulted. *Jackson*, 2018 WL 3581002, at *2–3. There, the complainant testified that she had used two different phone numbers to communicate with Jackson, that she had saved one of the numbers as "Eric Jackson" in her phone, that Jackson had sent her the text messages at issue, and that she remembered the text-message conversations shown in the proffered exhibit. *Id.* at *2. The complainant further testified that Jackson would text her to arrange in-person meetings at a stop sign near her home and that, on at least one occasion, he had walked her from the stop sign into the woods where he had raped her. *Id.* The text-message content referenced the stop sign, their having sexual intercourse in the woods, and a laptop Jackson had stolen when he burglarized the complainant's home. *Id.* Moreover, the

12

complainant testified that Jackson used the word "mines" rather than "mine," and the text messages contained this distinctive word choice. *Id.* This evidence was sufficient to support the trial court's preliminary authenticity determination and admission of the messages into evidence. *Id.* at *2–3.

As in *Chavezcasarrubias* and *Jackson*,[8] Cain was convicted of sexually preying upon a minor—Anna—based in part on text-message evidence, but Cain now denies authorship of the text messages purportedly sent from his phone and claims they were erroneously admitted. *See Jackson*, 2018 WL 3581002, at *1–2; *Chavezcasarrubias*, 2015 WL 6081502, at *1–2. Again applying *Butler*, we reach the same conclusion we reached in *Chavezcasarrubias* and *Jackson*; here, as in those cases, the trial court's preliminary authenticity finding and its admission of the text messages were supported by sufficient evidence of authorship, including (1) testimony from Anna that she knew the sender's phone number belonged to Cain, corroborated by text-message content showing that Anna had saved Cain's number as "dad" in her cell phone; (2) testimony from Anna that the challenged exhibit was a true and accurate reflection of the text messages she had exchanged with Cain; (3) testimony, corroborated by text-message content, that Cain's texts to Anna had provided accurate instructions on where to join him for in-person meetings and in-person abuse; (4) text-message content containing

---

[8]Unpublished opinions—including *Chavezcasarrubias* and *Jackson*—have no precedential value. Tex. R. App. P. 47.7(a). Nonetheless, we consider unpublished opinions with similar facts instructive and cite them in agreement with their guidance as to the application of settled law. *See* Tex. R. App. P. 47.4.

13

verifiable information regarding Cain's location and activities, as well as those of other members of Anna's household; (5) text-message content referencing and depicting Cain and Anna using their cell phones to videoconference via FaceTime; (6) text-message content reflecting identifying personal information specific to Cain; (7) text-message content referencing the sexual relationship between Cain and Anna—distinctive information that only Cain and Anna knew; and (8) text-message content demonstrating the unusual father-daughter dynamic between Cain and Anna due to Cain's dual roles as stepfather and sexual abuser.

First, when the State began to lay the predicate for the text messages' admissibility, Anna testified that she "kn[e]w [her] father's phone number or what it was [w]hen [the text messages were exchanged]," and she confirmed that she "recognize[d] the text messages [i]n [State's Exhibit 2] as being from [her] phone number to [her] father's phone number and vice versa." *See Jackson*, 2018 WL 3581002, at *2–3; *Chavezcasarrubias*, 2015 WL 6081502, at *2; *see also Damm v. State*, No. 02-16-00380-CR, 2018 WL 1528605, at *17 (Tex. App.—Fort Worth Mar. 29, 2018, pet. ref'd) (mem. op., not designated for publication) (affirming trial court's threshold authenticity finding based in part on testimony from text-message participant that the number she received the texts from was "the number she had routinely used to communicate with Damm"). Indeed, the text messages themselves showed that Anna had saved the sender's phone number in her cell phone as "dad." And—as in *Butler*, *Chavezcasarrubias*, and *Jackson*—we infer that the trial court

14

considered the contents of the texts themselves in determining their authenticity. *See Butler*, 459 S.W.3d at 602–04; *Jackson*, 2018 WL 3581002, at \*2–3; *Chavezcasarrubias*, 2015 WL 6081502, at \*2.

Furthermore, Anna—a participant in the text-message exchange—testified that "all the text messages in [State's Exhibit 2 were] accurate," that they were "[t]he exact way that [she] remember[ed] them," that the thumbnails of photographs exchanged via text message were "accurate photos that [she] sent to [her] father that he made [her] send," and that the messages were "[t]he way that [she] remember[ed] [her] father's responses to [her] and [her] texts to him." *See* Tex. R. Evid. 901(b)(1) (listing, as an example of "evidence that satisfies the [authentication] requirement," "[t]estimony that an item is what it is claimed to be"); *Jackson*, 2018 WL 3581002, at \*2; *Chavezcasarrubias*, 2015 WL 6081502, at \*2 (reiterating the rule that, "[f]or authentication by a witness with knowledge of an electronic communication, a witness qualifies as having knowledge when he participated in an exchange of messages and can testify to an exhibit's fair and accurate depiction of the messages exchanged"). As the State summarized before the trial court admitted the text messages into evidence:

> [S]he's said that she remembers them. She said that they're from her phone number to his phone number, and from his phone number to her phone number. She's read through every one of them and she testified on the stand that this is how she remembers the text messages and they're accurate.

Moreover, Anna testified that Cain sent her text messages to coordinate in-person interactions, and the text messages themselves referenced these interactions.

*See Butler*, 459 S.W.3d at 604 & n.11 (recognizing that references within a text message to other conversations or events can provide evidence of authorship). For example, Anna testified that Cain would text her at night and ask her to come into the living room of their home, and that, when she complied with such text-message requests and went "into the living room[,]. . . . he was waiting in his recliner" to fondle her breasts or perform other sexual acts. The timing and content of the text messages were consistent with this testimony; many of Cain's messages asked Anna to "come in here" late at night, followed by a "thank you" after a short gap in time.[9] Similarly, Anna testified that Cain would sometimes ask her "out to his office" where he would put his hand in her underwear and rub her vagina. Again, the text-message content was consistent with this testimony; in one late-night exchange, Cain asked Anna to "come see [him] . . . . [i]n [the] office," and about thirty minutes later, Cain sent a text message thanking Anna "for [his] moments of happiness." The texts were thus tied to Cain's in-person interactions with Anna and verified that he authored the messages. *See Jackson*, 2018 WL 3581002, at *2–3; *Chavezcasarrubias*, 2015 WL 6081502, at *2; *see also Butler*, 459 S.W.3d at 604 (recognizing that the timing of the defendant's threatening text messages to the State's primary witness the week before his trial provided circumstantial evidence of authenticity).

---

[9]After State's Exhibit 2 was admitted into evidence, Anna confirmed that Cain would often thank her via text message after inappropriately touching her—linking the author of the text message to the just-finished act of indecency.

16

The text messages referenced other, seemingly innocuous in-person interactions as well. In one text, Cain told Anna he was "[g]etting [her] some pizza" and the two exchanged messages regarding Anna's preferred pizza topping. Presumably, Anna would have detected if such a message had been authored by an imposter in possession of Cain's phone because the promised pizza would not have arrived. Anna's testimony that she understood Cain to be the author of the messages instead implied that the pizza arrived as anticipated—linking Cain to the texts. *See Butler*, 459 S.W.3d at 600–04 (recognizing that, when the text-message recipient stated she knew Butler to be the author of the texts because "he had even called in between the [text-message] conversations," "it [wa]s at least implicit" that the contemporaneous call she received was "from a person whose voice she recognized to be [the a]ppellant's").

And even when Cain's texts were not coordinating in-person interactions, his messages frequently contained verifiable information regarding his location within the family home as well as the locations and activities of other members of Anna's household. For example, in one nighttime exchange, Cain indicated that he was "[i]n [] bed," and Anna asked if her mother was with him. Cain responded "[n]ope" and stated that Anna's mother was instead "[o]n [the] couch." Such information would have been extremely difficult for an individual outside of Anna's household to falsify yet extremely easy for Anna to check. In another exchange, Cain indicated that he was "[m]aking progress in [the] garage" and asked Anna if "[her] mom [was] up

17

yet"—implying that her mother slept in late that day. Again, such messages reflected a knowledge of the daily life of Anna's family that few—if any—outside imposters likely possessed, and Anna presumably could have detected if the texts were forged. Anna's attribution of the text messages to Cain instead supported a reasonable inference that these everyday details were valid and linked the messages to Cain. *See Butler*, 459 S.W.3d at 603 (recognizing that text-message recipient's testimony identifying Butler as the author of the texts implied, among other things, that "the content and context of the text messages convinced her that the messages were from [Butler]").

The text-message exchanges also contained photographs and statements consistent with Cain's occupation, travel, and plans. *See id.* at 603 n.10 (recognizing that written communications such as letters "may be authenticated by distinctive characteristics such as the document's . . . location" (quoting Cathy Cochran, Texas Rules of Evidence Handbook 934 (7th ed. 2007–08))); *Gardner*, 2015 WL 4652718, at *2 (affirming trial court's threshold authenticity finding because, among other things, the text messages "showed that the sender was planning to commit a robbery" and discussed using a gun similar to one seen in the surveillance video of the robbery in which Gardner had been positively identified as a participant). For example, Anna testified that Cain was a truck driver, and on one occasion Cain sent Anna a photograph of the open roadway through the front windshield of what appeared to be

18

a truck.[10]  After Anna asked Cain where he was and when he would "get back," Cain texted that he was in "California" and was returning "[t]omorrow night."  Again, if Cain's phone had been "purloined" by another individual, it is doubtful that such individual would have known Cain's travel schedule and then-current location, much less have been able to forge an impromptu photograph consistent with Cain's surroundings.  *See Tienda*, 358 S.W.3d at 641–42 (discussing authenticity analysis and cautioning that "cell phones can be purloined").

Additionally, the substance of the messages referenced—and even depicted— Anna and Cain videoconferencing using the same cell phone numbers they used to exchange texts.[11]  Numerous text messages from Cain asked Anna to talk with him via FaceTime,[12] and one exchange contained a screenshot depicting their videoconference

---

[10]After State's Exhibit 2 was admitted, Anna testified that Cain sent her another photograph while he was on a cruise with her mother.  Specifically, Cain sent Anna a photograph of a small boat that appeared to be in the water near the cruise ship with the message "We [are] getting pulled over.  Lol."  The photograph and message were consistent with Cain's travel plans and his then-current geographic location, supporting the inference that he authored the texts.

[11]Although Anna did not expressly testify that she and Cain FaceTimed using the same cell phone numbers they used to exchange text messages, this could be reasonably inferred from Anna's testimony confirming Cain's cell phone number, and from the text-message content in which Cain repeatedly asked Anna to "Ft [him]."  *See Butler*, 459 S.W.3d at 603–04 (inferring from the authenticating witness's testimony that Butler "called in between the conversations talking mess" that the calls came from the same cell phone number used to exchange text messages).

[12]Cain and Anna often used the abbreviation "ft" rather than the full word "FaceTime."  However, Anna's occasional use of the full word "FaceTime" confirmed the meaning of the "ft" abbreviation, as did subsequent testimony.

19

on FaceTime.[13] Such messages were "yet another circumstance which made it reasonable for [Anna] (and hence, the jury) to conclude that [Cain] was the person who controlled the phone at the time that the text messages at issue were generated." *Butler*, 459 S.W.3d at 604 (recognizing that the appellant's phone call to the text-message recipient "in between the [text] conversations" was a circumstance indicating his authorship of the text messages); *see also Chavezcasarrubias*, 2015 WL 6081502, at *2 (relying in part on testimony from the recipient "that she knew that the phone number belonged to Chavezcasarrubias because she had called him on it and recognized his voice when he answered").

The substance of the text messages also contained identifying information specific to Cain. *See* Tex. R. Evid. 901(b)(4). For example, when Cain agreed via text message to pay for Anna's Apple Music subscription, he authorized her to "use [his] Bank of America card that ends in [XXXX],"[14] and he told her she could find it "in [his] wallet." The jury could infer that Cain was one of the few people—if not the only person—who knew the last four digits of his bank card and the then-current location of that bank card. Similarly, on his birthday, Cain sent numerous guilt-

---

[13]After State's Exhibit 2 was admitted, Anna testified that Cain would text to ask if she wanted to videoconference then call her on FaceTime to see her breasts. Anna explained that, on one occasion, she decided to take a screenshot because she "just kind of caught [Cain] in a freeze-frame and [] thought it looked funny, so [she] just saved it . . . . [a]nd then [she] sent it to him" via text message.

[14]We redact Cain's bank card number in accordance with Texas Rule of Appellate Procedure 9.10(a)(2).

inducing text messages and claimed Anna had "really broken [his] heart" by failing to realize that it was his birthday. The content of the text messages sent from Cain's phone thus indicated that the author's birthday was Cain's birthday.

Furthermore, the content of the text messages contained references to Cain's in-person sexual abuse of Anna—distinctive information only Cain and Anna could have been expected to know. *See* Tex. R. Evid. 901(b)(4); *Tienda*, 358 S.W.3d at 640–41 (recognizing that an individual may be sufficiently linked to authorship of an electronic communication if it "contain[s] information that only the purported sender could be expected to know"). In one text exchange while Cain was traveling, he asked whether "[m]y girls"—i.e., Anna's breasts—"miss me."[15] Then, later in the conversation, Cain responded to a nude photograph of Anna's breasts by stating that he "c[ould]n't wait to get home"—implying his intent to view or touch Anna's breasts in person. *See Jackson*, 2018 WL 3581002, at *2–3; *Chavezcasarrubias*, 2015 WL 6081502, at *2; *see also Gardner*, 2015 WL 4652718, at *2 (affirming trial court's threshold authenticity finding based in part on text-message content anticipating an in-person robbery similar to the robbery Gardner committed). Since Cain's sexual

---

[15]Although Cain's text messages did not expressly identify the "girls" he was referencing, the references were followed by Cain's pleas for "a pic" and Anna's reluctant transmission of a nude picture of her breasts. The context of Cain's references to the "girls" thus implied his meaning. Moreover, after State's Exhibit 2 was admitted, Anna testified regarding the exchange and confirmed that the "girls" referred to Anna's breasts.

abuse of Anna was not common knowledge while it was occurring, the text messages reflected knowledge of a sexual relationship of which only Cain and Anna were aware.

Even Cain's requests for photographs reflected a knowledge of his sexual abuse. Anna testified that Cain's in-person abuse often involved him fondling or sucking her breasts. Consistent with this testimony, many of the text messages contained in State's Exhibit 2 involved Cain soliciting photos from Anna and Anna reluctantly sending pictures of her breasts. The previously mentioned exchange on Cain's birthday was a prime example:

> [Anna] 2:45 a.m. I forgot what date it was I'm sorry[.] . . . Happy Birthday[.]
>
> [Dad] 2:48 a.m. You know what would really make it happy?
>
> . . . .
>
> [Anna] 2:50 a.m. Is it what I think it is[?] . . . A picture?
>
> [Dad] 2:54 a.m. Now that would be happy. Lol

The next text, which was from Anna to Cain, was a clothed photograph of her breasts. Cain responded "Lol. Nice. . . . I wish they blinked. That would be funny." But, unsatisfied, Cain asked for another picture only a few minutes later:

> [Dad] 3:03 a.m. Hit tha[t] send button and make my birthday happy.
>
> . . . .
>
> [Anna] 3:03 a.m. Thought I already did?
>
> [Dad] 3:03 a.m. Very close. Lol

[Dad] 3:06 a.m.  I love them[.]

     . . . .

[Anna] 3:08 a.m.  Idk

[Dad] 3:09 a.m.  I will delete.  You can check my phone.

Finally, Anna sent Cain a photograph of her naked breasts, to which he replied, "[h]appy birthday to[] me."  Yet, less than ten minutes later Cain was asking for more, texting, "Can I get one sitting up[?]"  Again, Anna sent him a naked photograph.  These repeated requests for photographs of Anna's breasts were consistent with Cain's in-person abuse—abuse of which only Anna and Cain were aware.

Moreover, Anna testified that Cain often used money or gifts to get her to comply with his sexual requests.  She described how, when she "started indicating that [she] didn't like what he was doing to [her] . . . he reached into his wallet and he showed [her] a 20-dollar bill."  Cain's text messages to Anna contained similar bribes for sexual favors.  At the end of the birthday exchange quoted above—in which Anna sent "dad" numerous photos of her breasts—he texted, "If your mama won't buy you something today just keep it in mind and I'll buy it for you."  On another occasion, Cain offered to "give [her] $1 to see them," on another he told her to "[s]end [him] a good pic and [she could] go get money out of [his] wallet," and on yet another he agreed to pay for an Apple Music subscription after receiving a nude photograph of Anna's breasts.  Just as Cain's sexual abuse of Anna was not common knowledge at the time it was occurring, the methods he employed to manipulate her were not

23

common knowledge; Cain's texts reflected knowledge only he and Anna possessed. *See* Tex. R. Evid. 901(b)(4).

Similarly, the content of the text messages in State's Exhibit 2 demonstrated knowledge of the unusual father-daughter dynamic between Cain and Anna stemming from Cain's dual roles as stepfather and sexual abuser. Anna regularly texted Cain to ask if she could purchase things such as clothes, a game, a phone case, jewelry, and an Apple Music subscription—items a teenager could reasonably be expected to ask her father to purchase. When Cain agreed to purchase the requested items—which he often used as bargaining chips for sexual favors—the items were purchased with Cain's finances, further linking him to the messages. The text messages also contained parental scoldings from Cain such as "[y]ou don't leave here without telling someone," and the messages were littered with "I love you" statements common in father-daughter relationships. *See Butler*, 459 S.W.3d at 604 (recognizing that the content of the text messages—calling the State's primary witness a "snitch" and threatening her the week before Butler's trial—was consistent with Butler's relationship with the witness and circumstantially linked him to the messages); *Hunsaker v. State*, No. 02-16-00331-CR, 2017 WL 4053897, at *4–5 (Tex. App.—Fort Worth Sept. 14, 2017, pet. ref'd) (per curiam) (mem. op., not designated for publication) (affirming trial court's threshold authenticity finding based on evidence that Hunsaker owned the cell phone that sent and received the text messages, and that the content of the text messages exchanged indicated a close relationship between the

24

authors consistent with the relationship between Hunsaker and his fellow gang member). But Cain frequently texted an expression of love in the same conversation as an inappropriate request for a nude photograph. Again, this content indicated that the author of the text messages sent from Cain's phone was aware not only of the sexual relationship between Cain and Anna but also of Cain's role as Anna's stepfather, and of the unusual dynamic created by these dual roles.

In sum, the State provided more than enough evidence to "bridg[e] the logical gap" and allow a reasonable jury to conclude that Cain authored and sent the text messages purporting to be from him and contained in State's Exhibit 2. Even if Cain had preserved his current authenticity complaint for review, his complaint would fail.

We overrule Cain's sole issue.[16]

---

[16]Furthermore, even if the trial court had erred by admitting the text messages, such error would have been harmless because Cain failed to object to other evidence proving the same underlying facts. "An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection." *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (quoting *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)). Here, at least two witnesses—Anna and Investigator Michael Young—testified regarding the contents of the challenged text messages, and the State read many of the text-message exchanges into evidence during their testimony. Cain did not object to this testimony. Thus, even if Cain had preserved his authenticity challenge, and even if the trial court had erred by admitting the text messages, any error would have been harmless. *See Sampson v. State*, No. 02-15-00202-CR, 2016 WL 4474339, at *3 (Tex. App.—Fort Worth Aug. 25, 2016, pet. ref'd) (mem. op., not designated for publication) (holding any error in the admission of photos—including photos of text messages–was harmless "because unobjected-to evidence prove[d] the same facts as the objected-to photographs"); *Mai v. State*, 189 S.W.3d 316, 323–24 (Tex. App.—Fort Worth 2006, pet. ref'd) (holding defendant failed to preserve error in the admission of a transcript "by not repeating [his]

## C. Clerical Error

We raise a final issue sua sponte; there is a clerical error in Cain's corrected judgment for possession with the intent to promote child pornography.

The corrected judgment states that Cain was convicted under Section 43.26(d)(1) of the Texas Penal Code—the subsection that penalizes possession of child pornography after a prior conviction. *See* Tex. Penal Code Ann. § 43.26(d)(1). But the record reveals that Cain was indicted, convicted, and sentenced under Section 43.26(e) of the Texas Penal Code—the subsection that penalizes possession with the intent to promote child pornography.[17] *Compare id.*, *with id.* § 43.26(e).

"Appellate courts have the power to modify whatever the trial court could have corrected by a judgment nunc pro tunc when the information necessary to correct the judgment appears in the record"; this authority "depends neither on a party's request nor on whether a party objected in the trial court." *Ette v. State*, 551 S.W.3d 783, 792 (Tex. App.—Fort Worth 2017), *aff'd*, 559 S.W.3d 511 (Tex. Crim. App. 2018); *see Baker v. State*, No. 02-19-00292-CR, 2020 WL 2202324, at *8 (Tex. App.—Fort Worth May 7, 2020, pet. ref'd) (mem. op., not designated for publication).

---

objection again each time the State asked Officer Richie to read from or refer to the transcript").

[17]The erroneous citation to Section 43.26(d)(1) did not originate with the corrected judgment; it was also present in Cain's original judgment for possession with the intent to promote child pornography.

The erroneous citation to Section 43.26(d)(1) in Cain's judgment for possession with the intent to promote child pornography appears to have been a typographical clerical error and not the result of erroneous judicial reasoning. *See Ex parte Poe*, 751 S.W.2d 873, 876 (Tex. Crim. App. 1988) ("A clerical error is one which does not result from judicial reasoning or determination."). Consequently, the citation could have been corrected by the trial court's entry of a judgment nunc pro tunc. *See Blanton v. State*, 369 S.W.3d 894, 897–98 (Tex. Crim. App. 2012) (reiterating the rule that nunc pro tunc judgments are "limited to clerical errors and are not appropriate for errors involving judicial reasoning"); *Collins v. State*, 240 S.W.3d 925, 928 (Tex. Crim. App. 2007) ("A judgment nunc pro tunc is the appropriate avenue to make a correction when the court's records do not mirror the judgment that was actually rendered."); *Roots v. State*, 419 S.W.3d 719, 723–24, 727–28 (Tex. App.—Fort Worth 2013, pet. ref'd) (quoting *Blanton*). We therefore modify the judgment to reflect the accurate statute for Cain's promotion-of-child-pornography offense: Section 43.26(e) of the Texas Penal Code. *See* Tex. R. App. P. 43.2(b); *Ponce v. State*, No. 02-19-00151-CR, 2020 WL 5949919, at *2 & n.9 (Tex. App.—Fort Worth Oct. 8, 2020, pet. ref'd) (mem. op., not designated for publication) (modifying judgment to correct clerical error); *Baker*, 2020 WL 2202324, at *8 (modifying clerical errors in the judgment on the court's own initiative).

## IV. Conclusion

Having overruled Cain's sole issue, we affirm Cain's judgment of conviction for continuous sexual abuse of a child and affirm as modified his judgment of conviction for possession with the intent to promote child pornography.

/s/ Dana Womack

Dana Womack
Justice

Publish

Delivered: March 18, 2021