

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00121-CR

———————————————

REGINALD DEWAYNE TAYLOR, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1827037

---

Before Sudderth, C.J.; Bassel and Walker, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant Reginald Dewayne Taylor appeals his conviction for the offense of possessing with intent to deliver a controlled substance, namely methamphetamine, of four grams or more but less than two hundred grams. *See* Tex. Health & Safety Code Ann. § 481.112(d). After the jury found a deadly weapon allegation to be true and found Taylor guilty, during punishment, they found a habitual-offender allegation to be true and assessed thirty-five years' confinement. The trial court sentenced Taylor in accordance with the jury's recommendation. In three issues, Taylor argues that the trial court erred by denying his first amended motions to suppress, admitting Instagram posts, and giving an unlimited extraneous-offense instruction to the jury.

As explained below, we reach the following holdings:

- the trial court properly denied Taylor's first amended motions to suppress because the information in the search-warrant affidavits and the reasonable inferences therefrom provided the municipal-court judge with a substantial basis for concluding that there was a fair probability that marijuana and other contraband would be found at the listed locations;

- the record custodian's certificate with the Instagram records substantially complied with the authentication rule and the unsworn-declaration rule, and alternatively, the testimony and surrounding circumstances also authenticated the Instagram posts; and

- it was not error to include in the limiting instruction the full list of purposes from Rule 404(b), or alternatively, even if that decision was error, the trial court did not commit reversible error by including such instruction because it benefitted Taylor.

2

Accordingly, we affirm the trial court's judgment.

## II. Background[1]

Officer Dewayne Lee with the Fort Worth Police Department testified that in May 2024, he began monitoring an Instagram account with the handle "taxmantrilly_" (TaxMan Trilly). That account regularly included videos showing large amounts of marijuana, currency, and firearms, along with a black male. According to Officer Lee, he used police databases and other photos to identify the black male appearing in the videos as Taylor due to his unique tattoos, including a teardrop under his left eye, a word under his right eye, and "1600" across his neck.

Officer Lee then researched what vehicles Taylor drove and what locations he frequented to determine where he might be storing the drugs, currency, and firearms. Through Officer Lee's access to the police database that contains videos from prior calls, he found a video that involved Taylor. The video showed a gray Chrysler 300, and Officer Lee's license-plate search revealed that the vehicle was parked at 824 Honey Dew Lane[2] (the Honey Dew house) in Fort Worth.[3] Officer Lee was able to

---

[1]To give context to the issues raised by Taylor, we offer the following narrative of the evidence presented at trial.

[2]Although the reporter's record uses "Honeydew Lane," the State's brief uses the spelling that matches the street name shown on a map of Fort Worth. *See* https://www.bing.com/maps/search?q=824+Honey+Dew+Ln+Fort+Worth%2C+TX+76120&cp=32.768053~-97.208582&lvl=16&style=r (last visited Apr. 9, 2026). *See generally* Tex. R. Evid. 201.

link a red Dodge Durango and a white Dodge Charger as being registered to Taylor. The white Dodge Charger was located at 516 Comal Avenue in White Settlement (the Comal residence).[4]

Officer Lee used the website realtor.com to see photos of the interior of the Honey Dew house and noted that they matched the photos that had been posted on the TaxMan Trilly Instagram page that showed narcotics inside the house. The TaxMan Trilly Instagram page also included postings showing the exterior and interior of the Comal residence, and Officer Lee was able to confirm the exterior matched the Instagram postings by going to that residence.

On May 23, 2024, based on a video on TaxMan Trilly's Instagram page showing several stacks of banded currency inside the Comal residence, Officer Lee asked a member of his team (Officer Steven Smith) to begin physical surveillance of that location while Officer Lee and another officer went to a location near the Honey Dew house to perform surveillance on it.[5] Officer Smith radioed that the red Dodge

---

[3]Officer Lee noted that there was a water bill in Taylor's name at the Honey Dew house and that Taylor freely entered and exited the location.

[4]In addition to police seeing him at the residence on several occasions, Taylor's birth certificate and temporary driver's license linked him to the Comal residence.

[5]Officer Lee believed that Taylor resided at the Comal address and used the Honey Dew location to sell narcotics; Officer Lee said that it was common practice for narcotics dealers to keep drugs and proceeds at one location and to deal at a different location so that if law enforcement "takes some kind of enforcement action against them, they don't lose all of their drugs, currency, or property." Officer Lee believed the Honey Dew house was a "trap house"—"a location, whether it be a[n]

Durango had arrived at the Comal residence and that Taylor had exited the vehicle and had entered the residence. Shortly thereafter, Taylor left the Comal residence carrying a "rectangular object."

Meanwhile at the Honey Dew house, Officer Lee saw several vehicles approach the house, including a Chevy Avalanche and a Dodge Charger. The vehicles left without any of their occupants entering the residence.

About thirty minutes to an hour after the vehicles had departed, Taylor arrived at the Honey Dew house in his red Dodge Durango and parked it in the garage next to a gray Chrysler 300. Officer Lee noted that Taylor was pulling a rolling bag or suitcase when he entered the Honey Dew house.

Approximately thirty minutes to an hour after Taylor arrived at the Honey Dew house, the previously seen Dodge Charger came back to the house, and it left after about five minutes. According to Officer Lee, "Directly after the Charger pulled out of the driveway, the Dodge Durango [that Taylor drove] exited the garage and pulled away from the house." The two vehicles met at a gas station, and the Dodge Durango driven by Taylor returned to the Honey Dew house.

Once Taylor was back at the Honey Dew house, the Chevrolet Avalanche that had previously stopped by returned. Taylor came out of the front door and waved at

---

apartment or [a] residence, that is solely occupied for the purpose of distributing narcotics"—because it contained no food, little clothing, only a couch and an air mattress for furniture, and a video monitor broadcasting live what was being recorded by the surveillance cameras on the residence.

the driver, later identified as Lynndale Thomas, who exited his vehicle and entered the Honey Dew house. Two to five minutes later, Thomas exited the house holding his pockets, which appeared to have a bulge in them. When Thomas returned to his truck, he opened a compartment in the bed of his truck and placed a large bag containing a green leafy substance into the compartment before leaving. At Officer Lee's request, the Directed Response Unit (DRU) officers stopped Thomas's truck after it left the residence. During the stop, the officers seized from the compartment a clear plastic bag containing 4.2 ounces of a green leafy substance that was believed to be marijuana. Officer Lee opined that Taylor was Thomas's marijuana source.

After another officer took Officer Lee's spot on surveillance of the Honey Dew house, he left to obtain search warrants for the Honey Dew house and the Comal residence. Officer Lee obtained two separate warrants[6] for those locations and submitted the warrant covering the Honey Dew house to the FWPD SWAT team to formulate a plan to safely execute the warrant because "[t]hey're specifically trained to serve warrants in what could be considered a dangerous situation."[7]

Prior to the SWAT team's arrival at the Honey Dew house, Officer Lee saw the red Dodge Durango leave the house. Officers stopped the Dodge Durango two blocks from the Honey Dew house, and Taylor was identified as the driver. Officers

---

[6]The search warrants were admitted for record purposes.

[7]Officer Lee noted that most narcotics locations are fortified in some way, and officers had observed cameras on the eaves of the Honey Dew house, thus providing Taylor with the capability to be notified when law enforcement was approaching.

detained him and found that he had two iPhones on his person. Officers took Taylor

back to the Honey Dew house.

After the SWAT team notified Officer Lee that the Honey Dew house was safe

to enter, he entered the house to search for the items listed in the search warrant.

During the search of the Honey Dew house (including the Chrysler in the garage),

officers found the following:

- In the Honey Dew house: materials for packaging narcotics, a vacuum sealer, a 5.7 Ruger pistol with nineteen rounds in the magazine and one in the chamber, and an AR-style pistol with an empty chamber and a full magazine;

- In the backseat of the Chrysler: 1.71 pounds of marijuana;

- In the Chrysler's trunk: an AR-15 rifle with one round in the chamber and a full magazine;

- In a suitcase in the Chrysler's trunk: 3.7 pounds of marijuana; and

- In a Nike backpack in the Chrysler: 59 grams of pink pills that tested presumptive positive for methamphetamine,[8] a black digital scale, a clear plastic bag containing 68 grams of psilocybin mushrooms,[9] and an FN 5.7-caliber pistol with one round in the chamber and nineteen rounds in the magazine.

Officers also seized a DVR from the Honey Dew house.

---

[8]Police submitted for testing three bags of pink pills, as well as powder and fragments, found in the backpack. The forensic scientist testified that one bag weighed 37.94 grams and contained methamphetamine; the other two bags had a gross weight of 13.301 grams.

[9]The forensic scientist testified that the weight was 50.621 grams of materials that contained psilocybin.

After the DRU team cleared the Comal residence, Officer Lee and other officers found $4,000 banded into $1,000 increments in a shoebox in the master bedroom closet and several vacuum-seal-type bags that were believed to have previously contained marijuana.

Officer Lee obtained a search warrant for the analysis of the data on the two cell phones and the DVR. Pursuant to that search warrant, FWPD Detective Sean Springer forensically analyzed the cell phones that were seized. Detective Springer testified that the analysis of Taylor's phone revealed text messages between him and a marijuana buyer orchestrating a sale at the Honey Dew house.

Officer Lee clarified that Taylor had not been charged with selling marijuana to Thomas; instead, Taylor was charged with possessing with intent to deliver the methamphetamine that was found in the Chrysler at the Honey Dew house. The charge was based on the amount of narcotics, the packing materials and scales, the presence of firearms, the FWPD's observation of individuals purchasing narcotics at the Honey Dew house, and the trap-style nature of the residence that was occupied solely for selling and distributing narcotics. As noted above, the jury found Taylor guilty, and he appeals from that conviction.

### III.  Motions to Suppress

In his first issue, Taylor argues that the trial court erred by denying his first amended motions to suppress. Specifically, Taylor contends that the search-warrant affidavits failed to establish probable cause that marijuana would be found at the

8

Comal residence and the Honey Dew house. Because, as explained below, a probable-cause determination is made by looking at the totality of the circumstances, rather than a hyper-technical analysis of the affidavits, we uphold the municipal-court judge's probable-cause determinations as to each location.

## A.    Standard of Review and Applicable Law

The Dallas Court of Appeals has recently set forth the standard of review and the law that applies to search-warrant-affidavit challenges:

> We normally review a trial court's ruling on a motion to suppress by using a bifurcated standard of review under which we give almost total deference to the historical facts found by the trial court and review de novo the trial court's application of the law. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). However, when the trial court is determining probable cause to support the issuance of a search warrant, there are no credibility determinations, and the trial court is constrained to the four corners of the affidavit. *Id.* Accordingly, we apply a highly deferential standard in reviewing a magistrate's[10] decision to issue a warrant due to the constitutional preference for searches to be conducted pursuant to a warrant. *Id.*
>
> A fundamental tenet of search and seizure law, whether federal or state, is that a search warrant must be supported by a probable-cause affidavit sworn by oath or affirmation. U.S. Const. amend. IV; Tex. Const. art. I, § 9; *Wheeler v. State*, 616 S.W.3d 858, 863 (Tex. Crim. App. 2021). Thus, a magistrate may not issue a search warrant without first finding probable cause that a particular item will be found in a particular location. *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012); *see also* Tex. Code Crim. Proc. [Ann.] art. 18.01(c) (providing that warrant may not issue unless affidavit supporting warrant sets forth sufficient facts establishing probable cause that (1) specific offense has been

---

[10]In this case a municipal-court judge signed the search warrant as permitted by Texas Code of Criminal Procedure Article 18.01(c) (setting forth a list of those who may issue warrants and including, among others, a judge of a municipal court of record). *See* Tex. Code Crim. Proc. Ann. art. 18.01(c).

committed, (2) specifically described property or thing to be searched for or seized constitutes evidence of such offense, and (3) the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched). The Texas Court of Criminal Appeals has articulated the pertinent test as follows:

> The test is whether a reasonable reading by the magistrate would lead to the conclusion that the four corners of the affidavit provide a "substantial basis" for issuing the warrant. Probable cause exists when, under the totality of the circumstances, there is a "fair probability" that contraband or evidence of a crime will be found at the specified location. This is a flexible, nondemanding standard. Neither federal nor Texas law defines precisely what degree of probability suffices to establish probable cause, but a magistrate's action cannot be a mere ratification of the bare conclusions of others. A magistrate should not be a rubber stamp.

*Duarte*, 389 S.W.3d at 354 (citations omitted).

We give great deference to a magistrate's probable[-]cause determination "to encourage police officers to use the warrant process rather than make warrantless searches and later attempt to justify their actions by invoking consent or some other exception to the warrant requirement." *Id.* We review the supporting affidavit realistically and with common sense, focusing on "the combined logical force" of the facts in the affidavit rather than "on what other facts could or should have been included." *Id.* at 354–55. We are to avoid analyzing the affidavit in "a hyper-technical manner." *McLain*, 337 S.W.3d at 271.

We must uphold the magistrate's decision if the magistrate had a substantial basis for concluding that probable cause existed. *Duarte*, 389 S.W.3d at 354. "When in doubt, we defer to all reasonable inferences that the magistrate could have made." *McLain*, 337 S.W.3d at 271 (quoting *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007)).

*Zuniga v. State*, Nos. 05-24-01066-CR–05-24-01070-CR, 2025 WL 3193787, at *3–4

(Tex. App.—Dallas Nov. 14, 2025, no pet.) (mem. op., not designated for publication).

## B. What the Record Shows

### 1. The Search-Warrant Affidavits

The search-warrant affidavits that Officer Lee drafted were identical, except the first paragraph of each gave a unique property description (one for the Honey Dew house and the other for the Comal residence) and the Honey Dew affidavit also gave a description of a red 2013 Dodge Durango. Officer Lee stated that marijuana was "alleged to be concealed" at the locations. Officer Lee then set forth eight paragraphs of facts and circumstances supporting his belief that marijuana would be found at the two locations. Because Taylor attacks the search-warrant affidavits as being deficient, we will follow the State's lead and set forth a brief description of each paragraph offering specific facts supporting the existence of probable cause followed by the affidavit's exact wording (with the exception of the first and eighth paragraphs).[11]

Paragraph one set forth Officer Lee's training and experience in narcotics investigations, including his experience in conducting electronic and visual surveillance of suspects.

Paragraph two described how Taylor became the suspect of a narcotics investigation:

> In May 2024, your affiant began monitoring a social media account on Instagram with the user name "taxmantrilly_[."] This account regularly

---

[11]Although the search-warrant affidavits include much of the same information that Officer Lee testified to at trial and that was summarized in the background section above, the search-warrant affidavits were admitted only for record purposes and therefore were not before the jury.

11

posts photos and videos of firearms, large quantities (felony amounts) of marijuana, and large amounts of U.S. [c]urrency. The majority of these photos and videos appear to [have been] taken by the same black male inside of a residence. The black male running this social media account has posted several photos of [himself] along with the narcotics, firearms, and currency. Utilizing police databases, I was able to locate a male by the name of Reginald Taylor B/M 04/20/1993 (hereinafter referred to as Taylor), who matches the physical description of the male in the Instagram posts. Your affiant was able to identify Taylor as the same person in the pictures by several unique identifying tattoo[]s on Taylor's face and neck. Taylor also posts to his Instagram account from inside of a red Dodge Durango. Research shows that Taylor has a red 2013 Dodge Durango registered to him bearing Texas License plate TXN1307. An NCIC/TCIC check of Taylor shows that Taylor had active warrants for Man/Del CS PG1 4g<200g, Assault Family Member with previous Conviction, Interference with an Emergency Call, and Unlawful Carrying of a Weapon with a Felony Conviction. Taylor was last convicted of a felony . . . on 08/19/2022 for the offense of Unlawful Carrying of a Weapon with a Felony Conviction on Tarrant County Cause number 1709100001. Due to being a convicted felon, Taylor is not allowed to possess [the] firearms that your affiant has seen Taylor handling in his Instagram post.

Paragraph three connected Taylor to the Honey Dew house:

On February 23[], 2024[,] Officer Strong #4614 responded to a call for service at 2612 Adams Fall Ln in regards to a civil issue rental disagreement. Your affiant watched Officer Strong's body camera of the call for service and observed that he was speaking with Taylor. Taylor identified himself to Officer Strong as Terrence Calton, and his girlfriend's name of [E.B.] along with a phone number for himself of 682-[###]-[####]. Taylor's girlfriend[']s actual name is [E.W.] Taylor lied to Officer Strong about his name due to having several active felonies warrants for his arrest. While reviewing the footage your affiant also observed a Gray Chrysler 300 bearing Texas temporary tag 1458N29, that was parked in the garage of 2612 Adams Fall Ln. Your affiant checked that license plate through a[] license[-]plate reader (LPR) system and found that it was parked at 824 Honey [D]ew Ln, Fort Worth, Tarrant County, Texas[,] on March 29[], 2024. While reviewing pictures from the interior of 824 Honey Dew Ln posted on Realtor.com,

it appeared that the interior matched that of the photographs posted by the Instagram account "taxman[]trilly_[."]

Paragraph four connected Taylor to the Comal residence and provided information regarding why Officer Lee believed that Taylor resided at that house and sold narcotics out of the Honey Dew house:

On May 22, 2024[,] your affiant located a white Dodge Charger bearing Texas license plate TXM 9300, which is registered to Taylor, at 516 Comal Ave. Officer Villeneuve #3391 was able to observe [E.W.] exit the Dodge Charger and enter into the front door of the residence. The exterior of this residence also matched the exterior that Taylor posted on his Instagram account the previous night, with the caption "my crib almost set up[."] Previously Taylor has posted stories to his Instagram complaining about the noise being made by jets at Lockheed Martin, which is approximately 1 mile from the 516 Comal Ave address. Taylor has made a post on his Instagram stating[, "W]hoever wonna sit all day at the spot and make money hit me asap I hate missing money in the morning[."] This leads your affiant to believe that Taylor does not reside at 824 Honey Dew Ln and uses it only as a location to traffic narcotics, while actually residing at 516 Comal Ave. This is consistent with the routes that Taylor's vehicle routinely travels . . . according to Flock activations. Flock is a license[-]plate reader[;] . . . the city has multiple cameras located in public places that monitor traffic and scan[] license plates. It appears that Taylor's red Dodge Durango travels into Fort Worth in the mid to late afternoon and then returns back to White Settlement late at night. It is common for narcotics traffickers to sell narcotics at one location and reside and keep proceeds at another[;] this is to minimize losses at either location if law enforcement learns of either location and conduct[s] any type of enforcement action. Your affiant also knows that drug deal[er]s will only typically take what they think they will sell to their other location and keep the rest at their primary residence also to minimize their losses.

Paragraph five described law enforcement's observations during their surveillance of the Comal residence on the day that the search warrants were issued:

13

On May 23, 2024, [y]our affiant observed Taylor post an Instagram video from within the Comal address. In the video[,] Taylor pans to the floor to show U.S[. c]urrency banded up on the floor. After seeing this video[,] Officer Smith #3316 began conducting surveillance at 516 Comal Ave. While Officer Smith was at this location, your affiant observed an Instagram post stating "all my people callin I'm on my way[."] Your affiant interpreted this message to mean that Taylor was on his way to the Honey Dew address to start distributing narcotics. It was after that post [that] Officer Smith observed Taylor arrive at 516 Comal Ave in his red Dodge Durango. A short while later, Officer Smith observed Taylor exit 516 Comal and walk towards the back-right passenger area of the Durango. He remained on that side of the vehicle out of Office[r] Smith[']s view for a short amount of time and the[n] walked to the driver[']s seat and entered the Durango. This behavior led Officer Smith to believe that Taylor had placed a larger unknown item in the back seat. Taylor then drove away from the location in the Durango.

Paragraph six described the observations made during surveillance of the Honey Dew house on the day the warrant was issued:

While Officer Smith was conducting surveillance at 516 Comal Ave, your affiant was surveilling 824 Honey Dew Ln. While your affiant was at this location[,] several vehicle[s] arrived at the residence and parked in the drive[]way. At one point[,] a passenger exited one of the vehicles and knocked on the door of 824 Honey Dew Ln. When the passenger received no answer at the door, [he] entered back into the vehicle and left the location. Approximately 20 minutes after Officer Smith observed Taylor leave 516 Comal Ave, your affiant observed the Dodge Durango arrive at 824 Honey Dew Ln and park in the garage of the location. Taylor exited the front seat wearing a black backpack and went to the back-right passenger door of the vehicle. Taylor opened the door and then removed what appeared to be a small rolling suitcase[] and then entered the residence.

Paragraph seven described Taylor's actions at the Honey Dew house and a suspected sale of marijuana at that location:

Approximately 25 minutes after Taylor arrived[,] a black Chevrolet Avalanche bearing Texas temporary tag 3363D72 pulled into the

14

driveway[;] Taylor exited the front door of the residence and waved to the driver as if telling him to come in. An NCIC/TCIC check of that plate showed it to come back to a black . . . Dodge Ram. A black male later identified as Lynndale Thomas B/M 08/17/1982 (hereinafter referred to as Thomas) exited the driver's seat and walked into the residence after seeing Taylor. A short time later[,] Thomas exited holding his pockets and walked to the bed of his truck. Thomas opened the driver's side bed compartment and placed a bag containing a green leafy substance that your affiant believed to be marijuana based upon my training and experience into it. The Chevrolet then exited the drive[]way[,] and officers began uninterrupted mobile surveillance of it. Officers with the [DRU] were notified and asked to stop the vehicle for the license plate violation observed on the vehicle. Officer Jimenez #4480 stopped the vehicle at 5400 Watauga Rd and made contact with Thomas who was the sole occupant inside the vehicle. During this contact[,] Officer Jimenez asked Thomas for consent to search his vehicle, which was freely and voluntarily given. In the driver's side bed compartment Officer Jimenez located a clear plastic bag containing a green leafy substance that he believed, due to his training and experience, to be marijuana. This was the same location where your affiant [had] observed Thomas place the bag once he exited the Honey Dew [house]. The total weight of the marijuana was 4.2 ounces and was documented in FWPD report 240040363.

Paragraph eight concluded that based on Officer Lee's investigation, he believed that Taylor and other individuals were "involved in the sale[] and distribution of marijuana from the residence located at 824 Honey Dew Ln and that Taylor [was] keeping additional proceeds, narcotics, [and] firearms at 516 Comal Ave[.]"

### 2. The Search Warrants

The municipal court judge signed a search warrant for each location allowing a search "[a]t said place" and any "other buildings, structures, places, and vehicles on said premises" for narcotics.

15

### 3.   The Motions to Suppress

Taylor filed mostly identical motions to suppress (and later filed first amended motions) as to each of the search-warrant affidavits.[12]   He claimed that the search-warrant affidavits are "mostly hope, dreams, aspirations, and assumptions."   Taylor attacked the search-warrant affidavits on, among other things, the bases that Officer Lee (1) did not describe the databases that he had used to identify Taylor, (2) "did not detail anything about his realtor.com search much less why . . . it caused him to believe this address was 824 Honey Dew," (3) did not retain the documentation related to his research, (4) did not state that he had conducted a title search on the Chrysler 300 or explain why its presence at the same place as Taylor established a connection, (5) did not explain how he determined that the Instagram post showing money was taken at the Comal residence, and (6) did not set forth facts related to "other possible drug activity"—e.g., pattern of frequent, quick traffic; undercover buys; complaints from neighbors—at the Honey Dew house.  Taylor also contended that "nothing about these Instagram posts suggests drug dealing."   The trial court denied the motions.

---

[12]His motion to suppress and his first amended motion as to the Comal residence included an additional paragraph stating that "there was no apparent basis for a search of Comal Ave" and that "the affidavit wanted us to believe that [Taylor] had taken [the drugs] from Comal Ave. to Honey Dew for sale."

## C.    Analysis

Here, Taylor contends that the search-warrant affidavits are "mostly speculation" and "did not establish a fair probability that marijuana would be found in any of these locations." Much of the remainder of Taylor's argument focuses "on what other facts could or should have been included" in the affidavits instead of focusing on "the combined logical force" of the facts that were actually in the affidavits. *See id.* at *4 (citing *Duarte*, 389 S.W.3d at 354–55).

Reviewing the supporting affidavits realistically and with common sense, we hold that the details in the eight lengthy paragraphs of the affidavits provided the municipal-court judge with a substantial basis for concluding that probable cause existed that narcotics would be found at the Comal residence and at the Honey Dew house, as well as in any vehicles on those premises. The affidavits explained how Officer Lee had taken note of the TaxMan Trilly Instagram account because of its photos and videos displaying what appeared to be marijuana, stacks of money, and firearms inside a home. The affidavits stated that Officer Lee had used databases to identify the person in the photos and videos as Taylor due to his unique tattoos and that the police database showed that Taylor had various active warrants, including one for manufacture and delivery of a Penalty Group 1 controlled substance. Officer Lee watched body-cam footage from a civil incident involving Taylor and observed a gray Chrysler 300 that was traced to the Honey Dew house. Using realtor.com, Officer Lee was able to see that photos of the Honey Dew house on that website appeared to

17

match those that were posted on the TaxMan Trilly account. Through surveillance from near the Honey Dew house location and reviewing the postings on the TaxMan Trilly Instagram account, Officer Lee was able to observe Taylor arrive with a rolling suitcase and watch what appeared to be a drug deal. All of these facts and circumstances in Officer Lee's search-warrant affidavit for the Honey Dew house provided probable cause that narcotics would be found at that location.

As for the Comal residence, Officer Lee explained in paragraph four of his affidavits how he had located a white Dodge Charger that was registered to Taylor at the address for the Comal residence. Another officer was able to observe the residence and see that it matched the photos that Taylor had posted on his Instagram account. Officer Lee detailed the travel between the Honey Dew house and the Comal residence that was revealed on the Flock system and how surveillance of the two locations and the Instagram account on the day the search warrant was sought demonstrated that Taylor was using the Honey Dew house as the location for selling narcotics and the Comal residence as the location where he kept additional proceeds, narcotics, and firearms. The combined logical force of the facts when read in a common-sense manner provided probable cause that narcotics would be found at the Comal residence.

Taylor contends that the affidavits could have offered additional details, but that begs the question of whether the affidavits provided sufficient detail. We agree with the State's conclusion that considering the totality of the information contained

in the search-warrant affidavits and the reasonable inferences therefrom, the municipal-court judge had a substantial basis for concluding that there was a fair probability that marijuana and other contraband would be found at the Honey Dew house and at the Comal residence on May 23, 2024. Accordingly, we hold that the trial court properly denied Taylor's first amended motions to suppress the evidence obtained as a result of the searches at the Honey Dew house and the Comal residence on May 23, 2024, and we overrule Taylor's first issue.

## IV. Authentication of Instagram Records

In his second issue, Taylor argues that the trial court abused its discretion by admitting Instagram records that accompanied a business-records affidavit that did not substantially comply with Texas Rule of Evidence 902(10) and that this harmed him. Taylor focuses solely on the business-records affidavit and ignores that the State was not limited solely to Rule 902(10) to authenticate the Instagram posts from his account. Because the certificate with the Instagram records substantially complied with the authentication rule and the unsworn-declaration rule, and alternatively, because the testimony and surrounding circumstances also authenticated the Instagram posts, we hold against Taylor on his second issue.

### A.    Standard of Review

We review the admission or exclusion of evidence for an abuse of discretion, which occurs only when the ruling falls outside of the zone of reasonable disagreement. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). Given

that standard, any ground or theory supported by the record may be used to affirm the ruling. *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008).

## B.  Applicable Law

We have recently explained authentication of exhibits:

> Authentication requires only "evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901(a); *Butler v. State*, 459 S.W.3d 595, 605 (Tex. Crim. App. 2015). Authentication "can be accomplished in a myriad of ways, depending upon the unique facts and circumstances of each case, including . . . through evidence showing distinctive characteristics." *Butler*, 459 S.W.3d at 601. The authentication methods listed in Rule 901(b) are not exhaustive; authenticating evidence need not exhibit any particular form or content and may be either direct or circumstantial. *See id.* at 602; *Jones v. State*, 572 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2019, no pet.). As long as the "fact-finder could rationally choose to believe the sponsoring witness, and the witness's testimony would establish that the item proffered 'is what its proponent claims[,]'" a trial court does not abuse its discretion by admitting it. *Butler*, 459 S.W.3d at 605. "Conclusive proof of authenticity . . . is not required." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018).

*Malone v. State*, No. 02-25-00052-CR, 2026 WL 70848, at *3 (Tex. App.—Fort Worth Jan. 8, 2026, no pet.). The Texas Court of Criminal Appeals has also explained how the Texas Rules of Evidence are "adequate to the task" for determining the admissibility of electronically generated, transmitted, or stored information, such as that found on social-networking websites. *Tienda v. State*, 358 S.W.3d 633, 638–39 (Tex. Crim. App. 2012); *cf. Butler*, 459 S.W.3d at 601–04 (considering text-message authentication). We have previously summarized that court's holdings, stating that "to the extent that an unchallenged business[-]records affidavit alone might not

20

otherwise be sufficient to authenticate social[-]media records, the surrounding circumstances, content, conversations, and events that precede or follow the disputed communications may provide the necessary contextual evidence to demonstrate the records' authenticity." *Brown v. State*, No. 02-23-00321-CR, 2025 WL 1840470, at *24 (Tex. App.—Fort Worth July 3, 2025, no pet.) (mem. op.).

Moreover, Rule 902(10) sets forth the requirements for self-authenticating evidence:

> The original or a copy of a record that meets the requirements of Rule 803(6) or (7)[ is admissible] if the record is accompanied by an affidavit that complies with subparagraph (B) of this rule and any other requirements of law, and the record and affidavit are served in accordance with subparagraph (A). For good cause shown, the court may order that a business record be treated as presumptively authentic even if the proponent fails to comply with subparagraph (A).
>
> **(A)** *Service Requirement.* The proponent of a record must serve the record and the accompanying affidavit on each other party to the case at least 14 days before trial. The record and affidavit may be served by any method permitted by Rule of Civil Procedure 21a.
>
> **(B)** *Form of Affidavit.* <u>An affidavit is sufficient if it includes the following language, but this form is not exclusive.</u> The proponent may use an unsworn declaration made under penalty of perjury in place of an affidavit.
>
> 1. I am the custodian of records [*or* I am an employee or owner] of _____ and am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities.
>
> 2. Attached are ___ pages of records. These are the original records or exact duplicates of the original records.
>
> 3. The records were made at or near the time of each act, event, condition, opinion, or diagnosis set forth. [*or* It is the regular practice of

21

_____ to make this type of record at or near the time of each act, event, condition, opinion, or diagnosis set forth in the record.]

    4. The records were made by, or from information transmitted by, persons with knowledge of the matters set forth. [*or* It is the regular practice of _____ for this type of record to be made by, or from information transmitted by, persons with knowledge of the matters set forth in them.]

    5. The records were kept in the course of regularly conducted business activity. [*or* It is the regular practice of _____ to keep this type of record in the course of regularly conducted business activity.]

    6. It is the regular practice of the business activity to make the records.

Tex. R. Evid. 902(10) (underlining emphasis added). Texas Rule of Evidence 803(6), which is referenced in Rule 902(10), explains how business records can be admitted despite the rule against hearsay:

A record of an act, event, condition, opinion, or diagnosis [is admissible] if:

    **(A)** the record was made at or near the time by—or from information transmitted by—someone with knowledge;

    **(B)** the record was kept in the course of a regularly conducted business activity;

    **(C)** making the record was a regular practice of that activity;

    **(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by an affidavit or unsworn declaration that complies with Rule 902(10); and

    **(E)** the opponent fails to demonstrate that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. "Business" as used in this paragraph includes every kind of regular organized activity whether conducted for profit or not.

Tex. R. Evid. 803(6). Additionally, as noted in Texas Rule of Evidence 902(10)(B), an unsworn declaration may be used in lieu of an affidavit, and the requirements for such declaration are set forth in Texas Civil Practice and Remedies Section 132.001(c): "An unsworn declaration made under this section must be[] (1) in writing[,] and (2) subscribed by the person making the declaration as true under penalty of perjury." Tex. Civ. Prac. & Rem. Code Ann. § 132.001(c).

### C.    What the Record Shows

For reference, we include a screenshot of the business-records affidavit at issue:

## Certificate of Authenticity of Domestic Records of Regularly Conducted Activity

I, Joshua Ledoux, certify:

1.  I am a duly authorized custodian of records for Meta Platforms, Inc. (hereinafter"Meta" or the "Company"), headquartered in Menlo Park, California and am qualified to certify Meta domestic records of regularly conducted activity.

2.  I have reviewed the records produced by Meta on June 27, 2024 in this matter in response to the Search Warrant received on June 12, 2024. The records include search results for Basic Subscriber Information, IP Address Logs, Messages, Photos, Transactional Information, Videos, Other Content and records for the account with identifier 53055842823.

3.  The records provided are an exact copy of the records that were made and kept by the automated systems of Meta in the course of regularly conducted activity as a regular practice of Meta. The records were saved in electronic format after searching Meta's automated systems in accordance with the above-specified legal process. The records were made at or near the time the information was transmitted by the Meta user.

4.  I declare under penalty of perjury that the foregoing certification is true and correct to the best of my knowledge.

Date: June 27, 2024

*Joshua Ledoux*

Joshua Ledoux
Custodian of Records

23

Officer Lee testified about the search warrant that was issued to the custodian of records for Meta Platforms and said that it requested records from May 1, 2024 to June 3, 2024, pertaining to an Instagram account with the user name TaxMan Trilly.[13] But when the State offered the Instagram records, the trial court sustained Taylor's objection that the business-records affidavit did not substantially comply with Rule 902(10). After the State rested its case and Taylor made the decision not to testify, the State moved to reopen its case to further discuss the sufficiency of the business-records affidavit. The State discussed several appellate cases, and Taylor argued that the business-records affidavit remained insufficient because it was not made "under penalty of perjury" and because it lacked "information that would allow [Taylor] to identify the person [i.e., the records custodian]." After hearing argument from counsel, the trial court decided to "allow the affidavit" and granted the State permission to reopen its case. Taylor did not request a running objection to testimony about the Instagram records.

The State then recalled Officer Lee to testify about the Instagram records. Officer Lee noted that the handle on the Instagram account was TaxMan Trilly, that the phone number for the account matched Taylor's phone number, and that the birth date matched Taylor's. Officer Lee also confirmed that he recognized the

---

[13]The search warrant for the Instagram records was admitted for record purposes.

profile photo on the TaxMan Trilly account as being Taylor and that it was the same as when he had begun watching the account in May 2024.

Officer Lee confirmed that the Instagram records were obtained via search warrant for "essentially the month of May [2024]," and he was able to confirm some of the posting dates based on the printed records. Officer Lee read aloud to the jury TaxMan Trilly's post from 10:49 a.m. on May 23 (which was while Officer Lee was at the Honey Dew house observing vehicle traffic): "All my people callin[g;] I'm on my way." A post from 12:16 p.m. on May 23 stated, "Come in. We're open." Videos from the TaxMan Trilly account were played, showing the Honey Dew house's kitchen island with marijuana, a digital scale, and packaging. The account also included a photo that had been taken from a video on TaxMan Trilly's Instagram page; the photo depicted two firearms with the caption, "57s, y'all think these MFers gonna hurt." Officer Lee testified that one of the FN 5.7-caliber handguns was seized from the Nike backpack that was found in the car in the garage at the Honey Dew house. Officer Lee confirmed that the methamphetamine was found in that same backpack. Officer Lee read another post from the Instagram account: "Trapping ain't dead you noggas just scared." Officer Lee was asked to define "trapping" and reiterated from his prior testimony that "trapping is when an individual is engaged in selling narcotics from a trap house location."

**D. Analysis**

Here, the certificate that accompanied the Instagram records substantially complies with the required language set out in Rule 803(6) and Section 132.001. The certificate states the following:

- "The records were *made at or near the time the information was transmitted* by the Meta user," as required by Rule 803(6)(A);

- "The records provided are an exact copy of the records that were made and *kept by the automated systems of Meta in the course of regularly conducted activity* as a *regular practice* of Meta," as required by Rule 803(6)(B)–(C); and

- "I declare *under penalty of perjury that the foregoing certificate is true* and correct to the best of my knowledge," as required by Section 132.001(c)(2). [Emphases added.]

The Houston First Court of Appeals looked at statements similar to these in a letter from a T–Mobile employee and concluded that the letter met the statutory requirements of Rule 803(6) and Texas Civil Practice and Remedies Code Section 132.001 to prevent the T–Mobile records from being excluded as hearsay because the letter (1) contained all of the declarations required to establish that the records were prepared through T–Mobile's regularly conducted activities and (2) stated that he "certif[ied] on penalty of criminal punishment for false statement or false attestation" that his statements were true and accurate to the best of his knowledge and belief. *Dominguez v. State*, 441 S.W.3d 652, 658–59 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see also Ryder v. State*, 581 S.W.3d 439, 455 (Tex. App.—Houston [14th Dist.]

26

2019, no pet.) (holding that exhibits containing Facebook's business records and a "Certificate of Authenticity of Domestic Records of Regularly Conducted Activity" were sufficient to authenticate records and "obviat[ed] the State's need to produce additional extrinsic evidence to satisfy the authentication threshold").

But even if the business-records certificate attached to the Instagram records did not satisfy the requirements of the business-records exception to the hearsay rule, it nevertheless established that the data came directly from Meta in response to a search warrant. And Officer Lee confirmed that the documents were produced in response to the search warrant.

He also compared the files to the printed documents and confirmed the dates. For example, the post about "people callin[g]" corresponded with Officer Lee's surveillance of the Honey Dew house on May 23 when two vehicles came to the house and left, and the post less than two hours later—"Come in. We're open"— corresponded with Officer Lee's seeing Taylor's coming to the house and one of the prior vehicle's returning. Moreover, Officer Lee testified that the birth date and phone number on the Instagram records for username TaxMan Trilly matched Taylor's and that the photo of Taylor on the account was the same as the one from when Officer Lee had first started monitoring the account. Given this evidence, the trial court could have reasonably concluded that the Instagram records were sufficiently authenticated. *See Malone*, 2026 WL 70848, at *3; *Brown*, 2025 WL 1840470, at *25 (stating that notwithstanding the business-records affidavits'

27

authentication, the remaining circumstances and testimony also authenticated the two messages).

Accordingly, we hold that the trial court did not abuse its discretion by admitting the Instagram posts, and we overrule Taylor's second issue.

## V. Sua Sponte Limiting Instruction

In his third issue, Taylor argues that he was harmed by the trial court's inclusion of an "unlimited extraneous[-]offense instruction"—one that included all of the permissible purposes for extraneous-offense evidence listed in Rule 404(b). Because this court has previously held under similar circumstances that a trial court does not commit reversible error by including an extraneous-offense limiting instruction in the charge, we will continue to follow our prior precedent.

### A.    Standard of Review

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error. Tex. Code Crim. Proc. Ann. art. 36.19; *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In other words, a

properly preserved error, unless harmless, requires reversal. *Almanza*, 686 S.W.2d at 171. A reviewing court must consider and analyze (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record. *Reeves*, 420 S.W.3d at 816; *see also Almanza*, 686 S.W.2d at 171 ("[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole.").

## B. The Charge's Limiting Instruction and Taylor's Objection

The jury charge included the following limiting instruction on extraneous offenses:

> The [S]tate has introduced evidence of extraneous crimes or bad acts other than the ones charged in the indictment in this case. This evidence was admitted only for the purpose of assisting you, if it does, in determining the *motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident* of [Taylor], if any, in connection with the offense alleged against him in the indictment in this case and for no other purpose. You cannot consider the testimony for any purpose unless you find and believe beyond a reasonable doubt that [Taylor] committed such other crimes or bad acts, if any were committed. [Emphasis added.]

Taylor objected to the charge on the basis that the language was "unlimited. It just parrots the -- the rule of evidence that allows the extraneous for any of these listed purposes. We would ask that this be limited to whatever purpose the State believes it goes to." The State responded that "the law does not require the State to

29

narrow . . . the purposes. We are offering it for all of these purposes." The State further argued that "limiting it in that way would be a comment on the weight of the evidence and would invade the purview of the jury in its deliberations." The trial court overruled Taylor's objection and left the charge "as it is."

## C. Applicable Law

We have previously set forth the law that we have followed when a trial court sua sponte includes an extraneous-offense limiting instruction in the charge:

As explained by the Waco Court of Appeals,

> A trial judge must—without any request or objections from the parties—prepare a charge that accurately sets out the law applicable to the charged offense. *See Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007); Tex. Code Crim. Proc. [Ann.] art. 36.14. The trial court is not required to include a limiting instruction in the jury charge when no instruction was requested at the time the evidence was admitted. *Delgado*, 235 S.W.3d at 254. [Appellant] did not request a limiting instruction pursuant to Rule 404(b) of the Rules of Evidence at the time that evidence of possible extraneous offenses was admitted; thus, this evidence was admissible for all purposes. *See id.* But [Appellant] has not cited, nor have we found, any cases holding that a trial court is prohibited from including a limiting instruction in such a situation.
>
> Instead, the Court of Criminal Appeals long ago considered and rejected an argument that the trial court reversibly erred by including a limiting instruction regarding extraneous offenses in the jury charge over the appellant's objection in *Fair v. State*.

*Steggall v. State*, No. 10-17-00017-CR, 2018 WL 3763747, at *2 (Tex. App.—Waco Aug. 8, 2018, pet. ref'd) (mem. op., not designated for publication).

30

The Dallas Court of Appeals summarized *Fair* and its progeny as follows:

> In *Fair v. State*, 465 S.W.2d 753, 754–55 (Tex. Crim. App. 1971), the defendant argued that the trial court erred in overruling his objection to a limiting instruction in the charge concerning extraneous offenses because the extraneous offenses had not been proven. The [C]ourt of [C]riminal [A]ppeals concluded that it was not necessary to give the limiting instruction because the evidence was admissible to prove the main issues of intent and motive. *Id.* at 455. But the court also concluded that "[t]he charge given was not harmful but beneficial to the appellant" and [that] there was no reversible error. *Id.* Additionally, in *Jasso v. State*, 699 S.W.2d 658, 662 (Tex. App.—San Antonio 1985, no pet.), the defendant charged with rape of a child argued that the trial court erred in giving a limiting instruction concerning an extraneous offense. The court concluded,

>> Appellant has cited no case and we have found none that holds that the giving of an instruction favorable to the accused, such as a limiting instruction on the use of extraneous offenses[,] constitutes reversible error. We believe there can be none because a benefit to the accused cannot be the basis for complaint.

> *Id.* Here, as in *Fair* and *Jasso*, the limiting instruction regarding extraneous offenses at the second punishment trial "was not harmful but beneficial to the appellant." *Fair*, 465 S.W.2d at 455. As a result, and regardless of whether there was error, we conclude there was no reversible error.

*Miller v. State*, No. 05-14-01355-CR, 2017 WL 34585, at *4 (Tex. App.—Dallas Jan. 4, 2017, no pet.) (mem. op., not designated for publication); *see also Steggall*, 2018 WL 3763747, at *2; *Ferreira v. State*, 514 S.W.3d 297, 301–02 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd); *Esparza v. State*, 513 S.W.3d 643, 648–49 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *Sadler v. State*, No. 01-14-00422-CR, 2015 WL 5136857, at *5–6

(Tex. App.—Houston [1st Dist.] Aug. 28, 2015, no pet.) (mem. op., not designated for publication).

> We agree with this line of cases and therefore hold that regardless of whether there was error, the trial court did not commit reversible error by including the extraneous-offense limiting instruction in the charge. *See Steggall*, 2018 WL 3763747, at *2; *Miller*, 2017 WL 34585, at *4; *Ferreira*, 514 S.W.3d at 301–02; *Esparza*, 513 S.W.3d at 649; *Sadler*, 2015 WL 5136857, at *6.

*Bridgefarmer v. State*, No. 02-19-00425-CR, 2020 WL 7258059, at *11–12 (Tex. App.— Fort Worth Dec. 10, 2020, no pet.) (mem. op., not designated for publication);[14] *see also Eleston v. State*, No. 02-24-00042-CR, 2024 WL 5083188, at *5 (Tex. App.—Fort Worth Dec. 12, 2024, pet. ref'd) (mem. op., not designated for publication) (holding that appellant was not egregiously harmed by the allegedly erroneous jury charge because even if it could be construed as a remark on an extraneous offense, the trial court's extraneous-offense instructions—that warned the jury about improperly considering extraneous offenses—would have benefitted rather than harmed appellant).

Moreover, any extra wording in a limiting instruction has been determined to be merely surplusage—not error—as explained by the First Court of Appeals in *Lauderdale v. State*:

> [T]his court has held that it is not error to submit an instruction that includes Rule 404(b) purposes that were not raised by the evidence,

---

[14]Neither of the parties points to this case. This is especially concerning because Appellant's counsel was the attorney for Bridgefarmer. *See* Standards for Appellate Conduct, *Lawyers' Duties to the Court* ¶ 4, Texas Rules of Court (State) 336 (West 2026), https://www.txcourts.gov/media/1437423/standards-for-appellate-conduct.pdf ("Counsel will advise the [c]ourt of controlling legal authorities, including those adverse to [his] position . . . .").

provided the instruction includes the 404(b) purpose about which the State did present evidence. *See Blackwell*[*v. State*], 193 S.W.3d [1,] 16 [(Tex. App.—Houston [1st Dist.] 2006, pet. ref'd)] (as long as instruction includes 404(b) purpose raised by evidence, inclusion of other [Rule] 404(b) purposes "amounted to surplusage that the jury could readily disregard because those issues were not pertinent to the trial"). We held in *Blackwell* that "although not as narrowly tailored to the specific issues involved as it could have been, the charge correctly instructed the jury to limit its use of the extraneous offense evidence to issues that were properly before it—the intent and motive of appellant to commit the offense against [the complainant]." *Id.*

This case is like *Blackwell*. The limiting instruction here included intent, which was raised by the evidence, and other [Rule] 404(b) purposes that were not, but the other purposes "amounted to surplusage[,]" and their submission did not constitute error by the trial court. *See id.* Further, the charge in this case instructed the jury to consider the extraneous offense evidence for no purpose other than the Rule 404(b) purposes. It therefore "by implication instructed [the jury] not to consider the extraneous offense evidence as substantive evidence of appellant's guilt." *See id.*

No. 01-13-00539-CR, 2014 WL 6679634, at *8 (Tex. App.—Houston [1st Dist.] Nov. 25, 2014, no pet.) (mem. op., not designated for publication) (holding that trial court did not err by overruling appellant's objections to extraneous-offense limiting instruction).[15]

## D.    Analysis

Here, as in *Lauderdale*, Taylor attacks the limiting instruction's inclusion of all the purposes listed in Rule 404(b). And although a criminal jury-charge treatise may note that a limiting instruction should "select the appropriate theory" under which the

---

[15]We recognize that this is a memorandum opinion, but neither party cited to it or the published case—*Blackwell*—that it discusses, despite that both are on all fours with the argument presented in this appeal.

33

extraneous evidence is admitted,[16] it nevertheless was not error for the trial court to include the full list of purposes from Rule 404(b). The trial court thus did not err by overruling Taylor's objection to the limiting instruction on the ground that it should have been narrowed. *See id.*

And to the extent that Taylor's third issue can be read to challenge the trial court's decision to include a sua sponte extraneous-offense limiting instruction in the charge, we follow our prior precedent and hold that even if that decision was error, the trial court did not commit reversible error by including such instruction because it benefitted Taylor. *See Eleston*, 2024 WL 5083188, at *5; *Bridgefarmer*, 2020 WL 7258059, at *12. We overrule his third issue.

## VI. Conclusion

Having overruled Taylor's three issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 16, 2026

---

[16]*See* Elizabeth Berry et al., *Texas Criminal Jury Charges* § 1:470 (2025 ed.).

34